Ruffin, C. J.
 

 As the devise from John Bracken to his daughter did not change the nature and the quality of the estate, which she would have taken had he died intestate, phe
 
 took by
 
 descent and not by devise; according to the well known preference of the common law for the title of descent. But it is, in truth, not material to consider that point, inasmuch as the fourth canon of descent puts a devise between such parties on the same footing with a descent.
 

 We have, then, the case of a purchase by John Bracken; a descent from him to his daughter, Julia Ann; and then a second descent from her to her daughter, Anna Jane, the propositus. The question is, who,
 
 quoad
 
 this land, is the heir at law of Anna Jane; whether the present plaintiff, who is the maternal half-sister of the mother of the
 
 propositusj
 
 or the brother and sistep of John Bracken, the maternal
 
 *317
 
 grandfather of the
 
 propositus,
 
 and by whom the estate was brought into the family? .
 

 The solution of the question mainly depends on the fourth canou of descents; which more particularly embraces this case. It provides, “that on failure of lineal descendants, and where the inheritance has been transmitted by descent from an ancestor, or has been derived by gilt, devise or settlement from an ancestor, to whom the person thus advanced, would, in the event of such ancestor’s death, have been heir, or one of the heirs, the inheritance shall descend to the next collateral relations of the person last seized, who weie of the blood of such ancestors, subject to the two preceding rules.” The argument for the plaintiff is, that, as the descent, which the canon enacts shall take place, is that
 
 from
 
 the propositus immediately, so that which gives the estate its quality, as an estate descended, is the descent to the pro-positus
 
 immediately;
 
 and, therefore, that in looking for the heir of Anna Jane, we can go no farther back than her mother, Julia Ann, from whom the descent was the immediate one to the propositus.
 

 The court does not think that the proper construction of the act. We do not think its language ties down the construction so strictly; and we know that it is not in accordance with judicial interpretation hitherto received, and is directly opposed to the recorded purpose of the Legislature.
 

 At common law every inheritance was either
 
 antiquum
 
 or
 
 ut
 
 antiquum, and, in assigning an heir to the person last seized, we had
 
 to look
 
 farther than merely to find the nearest relation of that person, and had to discover who was his nearest relation of the blood of the first, or supposed first, purchaser of the estate. In respect to land purchased by a propositus, that rule is abrogated here by the act of 1808; and it descends indiscriminately to all his relations in equal degree of either side. But in respect to lands actually descended — and those placed by the act on the same footing. — . the rule of the common law is, at least in part, preserved' and re-enacted. The principle of the enactment is, that in the descent of an estate, which was derived by descent, respect shall be had to that mode of its derivation; and the heir
 
 *318
 
 must be of the blood of the person, from whom it was thus derived. This the plaintiff must admit; for her claim is founded on it, as being the nearest relation of the propositus 011 the side of her mother, from whom-the land descended to Anna Jane. But it is said, it stops in its application, at the descent to-the propositus, and does not go back to a previous descent to the mother herself. Now that, it seems to us, is to make the principle mentioned, inconsistent with itself. As has been observed, this principle is that of the common law to a certain-extent, and, therefore, as far as it goes, it is to be applied -to -cases arising under the statute, as it would be at common law. , An estate derived by descent is, therefore, to go in a course of descent to the blood of him or them from whom it was so derived,- unless
 
 otherwise
 
 provided in other parts of the act. By a proviso to the sixth section, for example, parents a-re, in certain cases, let in for life. But-that does not impugn the general rule declared, that the -hei-r must be of the blood of the ancestor from whom the land descended; and we are -only further te- enquire, what ancestor is the one meant, from whom the inheritance was thus transmitted. -In pursuing that enquiry, it is to be borne -in mind, that the Legislature was not essaying to provide in •detail for every possible case; but was providing general mips or canons, founded on
 
 certain principles,
 
 by the application of which to cases as they might arise, the ambiguity would be avoided, which, almost inevitably attends the attempt to regulaíé so extensive a subject by descending to every particular in detail.
 
 The principie,
 
 in respect to that -portion of the law of descents now under consideration, we -have just seen to -be, that the blood of an ancestor, from whom the land descended, must be in the person who claims to inherit that land- It is true, the present plaintiff is of the blood of the person from whom the estate
 
 last
 
 descended, when it came to’the propositus; being her mother’s maternal sister. And it may be admitted, that this would be a case within the words of the act, if it were the apparent legislative intention to adopt a principle, to which the words, in that restricted sense, would be appropriate. But, why adopt that restricted sense; or, rather, how -can it be done? - The
 
 *319
 
 case specified in the act is, “where an inheritance has been transmitted by descent from an ancestor.” If it be asked
 
 what
 
 ancestor, the act does not answer,
 
 the hist
 
 from whom it descended to the propositus. On the contrary, it leaves it more at large: a “descent from
 
 an
 
 ancestor;” and may, therefore, mean any and every descent from an ancestor, ora succession of ancestors, through'whom the inheritance has been transmitted. And, it it so mean, then it follows, that “ such ancestor,” in the latter part of the canon, must also embrace every ancestor from whom tire inheritance has come 'mediately or immediately to the propositus; and so we should have to go up to the first, instead of the last, ancestor, from whom the descent was cast. The-utmost extent to which the plaintiff’s argument can reach, is, that the language of the canon is not as explicit as it might, perhaps, have been. But whatever ambiguity there may be in it, is very slight; and probably arises from the brevity, occasioned by a reluctance to mar the act by the cumbrous tautology of repeating after the words “such ancestor,” these others, “from whom it was transmitted by descent, or derived by gift or devise or settlement, to the person so last seized, or to any other person from whom it was, in like manner, transmitted to the said person so last seized.” Whatever may be deemed equivocal in the language by hypercrilicism, is, however, rendered sufficiently clear by the plain meaning of the Legislature- as seen in the principle, on which the canon rests. When it is once declared that the blood of the person from whom an estate descended is to regulate the future succession thereto, the law and good sense must concur in requiring us to trace the line back to him from whom it originally descended; provided, the line of descents or advancements has been unbroken. It would be strange if this were not so; that is, if we are to respect blood at all. From the rule of the common law, that inheritances should descend to the collateral relations of the person last seized, being of the blood of the first purchaser, was deduced, as a corollory, this ma-ximr “ that he who would have been heir to the father” (or mother-as the case may be) “of the deceased, shall also be heir to the son” (or daughter.) This is stated by Mr, Blaekstone, 2.
 
 *320
 
 Com. 223, to hold universally in thatlaw, except in the case of a brother or sister of the half-blood; which depends on special grounds. The same maxim must, in the nature ot things, attach to our case and every other, which respects the line through which the inheritance travelled. Consanguinity once established, as the test of the right to inherit, must be followed throughout. If the present defendant were to marry again, and have issue, it is certain that issue could not inherit this land, being neither of the blood of the mother or maternal grand-father of the propositus — that is, while any of that blood can be found. In the like manner, if the mother of tiie propositus had died without issue, this inheritance would not have gone to the present plaintiff, her maternal half-sister, but would have gone to her paternal uncle and aunt, Now, it would seem most extraordinary, that while the paternal half-blood of the propositus is excluded, yet the mother’s half-sister,
 
 ex parle materna,
 
 should be admitted to inherit from the propositus, though she could not inherit from the mother herself; because this inheritance came to the mother,
 
 ex parle paterna.
 
 Why should the law
 
 exclude
 
 the deceased’s paternal half-blood, and not exclude all other half-blood not being oí that side whence the land comes? The incongruity, thus apparent, in the doctrine contended for, proves that it is contrary to the intention of the act. It follows, we think, from the principle on which the Legislature went, as collected from the act, and also from the language used, that when an estate comes to a person
 
 through
 
 a series of descents or settlements, and that person dies without issue, it results bacs to those of his collateral relations who would be heirs of the ancestor from whom it
 
 originally
 
 descended, or by whom it was
 
 originally
 
 settled.
 

 Although our attention has not been particularly directed to this point in any previous case, yet it has not been entirely unpereeived. The general impression, made, at least, on my mind, from reading the act, without any special reference to this question, cannot fail to be seen in the opinion delivered in
 
 Burgwyn
 
 v
 
 Bevereux,
 
 1 Ired. 583. I took it for granted, that an inheritance which has descended, no matter
 
 when,
 
 and I might have added, no
 
 matte,r from
 
 whom, or
 
 how ma~
 
 
 *321
 

 ny
 
 — shall descend to the blood of the ancestor, from whom it did descend: which, of course, includes the ancestor from whom it first descended.
 

 But the impression on Judge Henderson’s mind is yet more plainly expressed in
 
 Bell v Dozier,
 
 1 Hawks 333. He says, the same principle which excludes a maternal half-brother from an inheritance
 
 ex parte
 
 paterna, would exclude all other half-blood, not of the blood
 
 of
 
 the first purchaser. For which reason he thought, indeed, the words “such ancestor” should be struck out of the aet, and “first purchaser” inserted in their place. In the construction I entirely agree; though not in the necessity for the proposed change of phraseology. The term “ purchaser” was, no doubt, purposely omitted. The canon provides for the descent, not only of descended estates, but also of certain purchased estates; and to all of them, as forming one class, the phrase “first purchaser,” could not, without some confusion, be applied; But when the descent is to be in a particular family, we necessarily go back to the person, who brought the estate into the family, that is the first purchaser, though he he not so described. But besides the language which fell from Judge Henderson in
 
 Bell v
 
 Dozier, the judgment itself, in that case, is an authority in point in this case, though the question seems not to have been there discussed. Peter Barnard purchased the land; and upon his death it descended to his two children, Elizabeth and Jesse: and upon the subsequent death of the former, the latter took her half
 
 as her heir.
 
 Yet, when Jesse afterwards died, it was held, that the half which descended from her father to Elizabeth, and from her to .1 esse, as well as Jesse’s original half, descended to the brothers and sisters of the father, Peter, and not to a maternal half-sister of Elizabeth and Jesse. Now, the principle of the decision as to Elizabeth’s half, of which there were two descents between the father and Jesse, is precisely apposite to the present case; in which the plaintiff claims as the maternal half-sister of the person from whom the immediate descent was to the propositus, Anna Jane. If any thing farther were necessary to open to us the sense of the act, we have it in the plain declaration of the purpose of the
 
 *322
 
 Legislature, as set forth iu the report of the committee which considered this important subject, and brought in the bill, as it passed. In that document, it is stated, amongst other things, “ that it was difficult” (under the previous acts) “to understand the meaning of the Legislature on several points:” of which, one was, “ whether it was designed
 
 to retain
 
 a preference in favor of relations
 
 of the Mood of the purchasing ancestor.”
 
 Then, afterwards, it proceeds to say, amongst other things, “
 
 that the fourth rule has for its principal object the securing to the family of the
 
 man,
 
 by whose industry the property toas
 
 acquired,
 
 the enjoyment of such
 
 property,
 
 in preference to
 
 those,
 
 who have no consanguinity mth him.”
 
 *
 
 (Note a.)
 

 The foregoing considerations produce a very clear opin
 
 *323
 
 ion, that the plaintiff is not the heir of Anna Jane Bracken; and, therefore, has not the reversion in fee of the land,' so as to enable her to maintain this action for the waste committed.
 

 Per Curiam. Judgment affirmed.
 

 (Note a.)
 

 In accordance with the suggestion of the Chief Justice, and as the report referred to in this opinion has been more than once introduced in discussion before the Supreme Court, the Reporter has thought it not irrelevant to present the report in this note, more especially as the Bill reported by the committee (as he has understood) was adopted without any amendment, and as tho law constitutes a prominent feature in our legislation. The following is an official copy of the report referred to:
 

 Journal of the House of Commons, Friday, December 8th,
 
 1808.
 

 Mb. Gaston, from the committee, who were directed to inquire into the expediency of amending the law of descents, reported, That having assiduously examined into the important subject referred to them, they iind that the various acts, which have been passed
 
 to
 
 regulate the course of descents, are so replete with ambiguities, that it is difficult to undeistand the true meaning of the Legislature; whether it was designed to retain a preference in favor of relations of the hlood of the purchasing ancestor; whether kindred on the part of the father were to have a prior claim to those of the mother; whether the provision in favor of one half-blood over the other did not apply to the whole blood also; whether the abolition of the distinction between males and females was confined to individuals or extended to stocks; and whether the provision in favor of parents comprehended the case of lands inherited by the intestate, are all questions, on which the most intelligent may differ, and which must occasion the most extensive litigation. Your committee, conceiving that ceTtainty in the law of descents is of the utmost importance and of universal consequence, have been anxious to discover whence this ambi
 
 *323
 
 guity in the existing law has arisen, that, in endeavoring to remove it, ;fchey might avoid the cause by which-it has been occasioned. They believe that all these errors have arisen from the Legislature having undertaken to define, with minuteness, the eases which might occur, and having undertaken to make provision for each of them, instead of establishing certain plain and general principles, which might be susceptible of application in every instance. Your committee, strongly impressed with this belief, have conceived,it their duty to attempt the framing of rules, embracing such principles; and, in making such rules, they have been studious to conform, as nearly as might be, to the existing law. The three first rules, it will be perceived,-do not introduce any innovation in -those which now prevail, and would be altogether unnecessary, were it not for the advantage which is derived from bringing together all the rules upon the subject. The fourth rule has for its principal object the securing to the family of the man, by whose industry the property was acquired, the enjoyment of such property, in -preference to those who have no consanguinity with him. The fifth rule is designed to embrace those cases, in which the intestate was himself the first purchaser, and -in which reason dictates that.his nearest relations should succeed to his estate, whether on the side of his father or mother. The sixth rule is but a simple affirmation of principles now existing. The-proviso is founded upon that sentiment of natural affection, which has received the sanction of the Legislature in the two acts of 1784. The committee ■have deemed it advisable, to avoid all uncertainty, that the proviso shoud embrace every case, in which the collateral kindred are more remote than the issue of brother and sister, and to prevent the inconvenience, .which might result from.interrupting the general course of descent, they have proposed that the provision should be for life only. (Note by reporter. This refers to the provision for parents.) Your committee do therefore recommend that the bill accompanying thi's report, entitled “ A -bill to regulate descents” be put on its passage and enacted into a law. (See this act in the first six sections of the Rev. Stat. c. 38).