PEARSON, J. dissentiente. Under the act of 1808, land descends percapita among the next collateral relations who are in equal degree. When those more remote bring themselves up to an equality by the right of representation, they take per stirpes. *Page 71 
Eve Clement, had two brothers, Adam and Henry, both of whom died in her life-time. Adam Clement, left him surviving; an only daughter, Susan, who married Charles Cauble.
Henry Clement, had seven children, Jesse A. Clement, Mary, the wife of William March, who has since died without children; Sarah, the wife of James Ryan; Henry, who died leaving seven children; Godfrey, who died leaving three children; Margaret Sain, who died leaving three children; and John, who died leaving seven children. Henry, Godfrey, Margaret and John, died prior to the year 1851. (83)
Sometime in the year 1954, Eve Clement died, without children, seized in fee of several tracts of land. At the Fall Term, of that year, this bill was filed for the purpose of having the land sold for partition, and the proceeds divided among the heirs at law of Eve Clement. The decree was obtained, the land sold, and a reference made to the Clerk and Master, to report how the funds arising from the sale, should be distributed.
The Clerk and Master reported that the fund should be divided into two equal parts, one of which should be paid to Charles Cauble and his wife, the representatives of Adam Clement. The other, to be subdivided into six equal portions, one of which was to be given to each of the children and the representatives of the children of Henry Clement.
The report was excepted to, and it was insisted that the division should have been equal among the nephews and nieces of Eve Clement, they being her next collateral relations, and that the grand nephews and grand nieces might represent their deceased parents. Upon the cause coming on to be heard, the exception was sustained, and it was decreed that the fund should be divided into seven parts, and that the distribution be as follows: To —
Jesse A. Clement, one share.
James Ryan and Wife, one share.
The eight children of Henry Clement, Jr., one share.
The three children of Godfrey Clement, one share.
The three children of Margaret Sain, one share.
The seven children of John Clement, one share.
Charles Cauble and wife, one share.
From which decree, Charles Cauble and wife, appealed to the Supreme Court.
Eve Clement died intestate and without issue, in the year, 1851, seized of certain tracts of land in the County of Davidson, (84) and leaving as her heirs at law, certain nephews and nieces, and great nephews and nieces, who were the children and grand children of her deceased brothers, Adam Clement and Henry Clement; of these, Susan, the wife of Charles Cauble, is the only child of Adam Clement, and the others, are the children and grand children of Henry Clement. Upon the petition of the heirs at law, the lands were sold for partition, and upon reference to the Clerk and Master to ascertain how the proceeds should be divided, he made a report in which he declared that Susan Cauble, being the sole descendant and representative of her deceased father, Adam Clement, was entitled to one half, and that the other half was to be divided among the living children of Henry Clement, and his grand children by deceased parents, each of his children taking a share, and his grand children taking a share for each class as representing its deceased father or mother. To this report, the descendants and representatives of Henry Clement, filed an exception, and insisted that "the division should be equal among the nephews and nieces, they being the next collateral relations of Eve Clement, the person last seized, and the grand nephews and nieces representing their ancestors, and standing in the same place of their ancestors as though they were still living." The judge, in the Court below, sustained the exception, and directed a division accordingly; and from the decree, Charles Cauble and his wife, Susan appealed to this Court.
The question presented in the appeal is, whether Adam and Henry Clement, the deceased brothers of the person who died last seized, are the ancestors from who, according to our canons of descent, the right of representation is to be traced; or whether their children, the nephews and nieces of thepropositus, who were living at her death are to claim in their own right, without regard to parentage, together with her great nephews and nieces, who are to take by classes, representing their deceased fathers or mothers, respectively?
It is admitted, that if the English canon of descent, which relates to the right of representation, is not changed or modified in this State by our canons of inheritance, which abolish primogeniture (85) among the males, and the preference of males over females, then the exception ought to have been overruled, and that the decree must now be reversed. But it is strongly insisted that such change or modification has been effected as a necessary consequence of the adoption of the canons to which we have referred. It is said, and that is the *Page 73 
main basis of the argument, that the English rule is founded upon the double preference which their law gives, first to the male issue, and next to the first born among the males; and for this is quoted the high authority of Black. Com. vol. 2, page 218, and then the inference is drawn, that as we have abolished both preferences, the right of representation in the extent to which it is carried by the English rule, must fall with them. I do not feel myself bound to admit that the English rule was founded solely upon the two canons, by which Mr. Justice BLACKSTONE has sought to justify it, in opposition to the Roman law on that subject; but if I were, I think I can show conclusively that our law, while abolishing the English canons of primogeniture, and the preference of males over females, has in all other respects, expressly retained their canon on the right of representation, in its full force and effect.
In order that my argument may be the better understood, I think it necessary to state in full, the English canons of descent. They are seven in number, and are as follows:
"1. Inheritances shall lineally descend to the issue of the person who last died, actually seized, in infinitum, but shall never lineally ascend."
"2. The male issue shall be admitted before the female."
"3. When there are two or more males in equal degree, the eldest only shall inherit, but the females altogether."
"4. The lineal descendants in infinitum of any person deceased shall represent their ancestors; that is, shall stand in the same place as the person himself would have done had he been living."
"5. On failure of lineal descendants or issue of the person last seized, the inheritance shall descend to his collateral relations, being of the blood of the first purchaser, subject to the three preceding rules."
"6. The collateral heir of the person last seized, must be his (86) next collateral kinsman of the whole blood."
"7. In collateral inheritances, the male stocks shall be preferred to the female, (that is, kindred derived from the blood of the male ancestors, however remote, shall be admitted before those from the blood of the females however near,) unless where the lands have in fact descended from a female."
These canons or rules of inheritance, were brought by our ancestors to this country; prevailed here during the Proprietory and Provincial Governments, and surviving the revolution, were firmly established in the independent and republican State of North Carolina. Of this, we have the most unquestionable evidence in the recitals contained in the *Page 74 
Act of the first General Assembly of 1784, by which the first change in our rules of descent was effected, (see Act of 1784, ch. 204 of the Rev. Code of 1820). That Act, after reciting, that "whereas it will tend to promote that equality of property which is the spirit and principle of a genuine republic, that the real estates of persons dying intestate should undergo a more general and equal distribution than has hitherto prevailed in this State," proceeded to provide for an equal distribution of an intestate's land among his sons, and for want of sons, among his daughters, as tenants in common, requiring advancements to be accounted for, and establishing the right of representation in case any child, son or daughter, had died in the life time of his or her father, leaving lineal descendants. The third section of the same act, after a recital that "it is almost peculiar to the law of Great Britain, and founded in principles of the feudal law, which no longer apply in that government, and can never apply in this State, that the half blood should be excluded from the inheritance," declared that the half blood should succeed in certain cases, with the following proviso in favor of the right of representation: "If any brother or sister of the intestate shall have died in the life time of the intestate leaving issue, male or female, such issue shall represent their deceased parent, and stand in the same place he or she would have done if living, and shall be entitled to the same part or portion of the estate of his or their uncle or aunt, as (87) his or their father or mother would have been entitled unto if living, such part or portion to be divided among such representatives, if more than one, among all the sons, and for want of sons, among all the daughters equally, share and share alike, as to tenants in common, and not as joint tenants." In the 4th section it is enacted "that the same rules of descent shall be observed in lineal descendants and collaterals respectively, when the lineal descendants shall be further removed from their ancestors than grand children; and when the collaterals shall be further removed than the children of brothers and sisters."
The 7th section, after reciting that "Whereas, by the law of descents, as it now stands, when any person seized of a real estate, in fee simple dies intestate without issue, and not having any brother or sister, such estate descends to some collateral relation, notwithstanding that the intestate may have parents living, a doctrine grounded upon a maxim of law not founded in reason, and often iniquitous in its consequences," enacted that, in such cases, the estate shall be vested in the father, and if he be dead, then in the mother in fee, unless the estate was derived from one of the parents, and then in that parent from whom it was so derived. *Page 75 
These enactments, it will at once be perceived, made radical and important changes in the law of descents in this State. They, after reciting the evils of the existing rules, abolished primogeniture among males; admitted the half blood to inherit in certain cases, and essentially modified the rule excluding lineal ascents. But they did not complain of, nor alter in the slightest degree, the principle of canon of the right of representation, either among lineals or collaterals; so far from it the Legislature seemed anxious to prevent an inference to that effect. They, therefore, expressly declared the continued existence of that canon by the before recited proviso to the 3d section, and by the 4th section in terms too plain to be misunderstood, and too strong to be resisted: —
"If any brother or sister of the intestate shall have died in the lifetime of the intestate, leaving issue, male or female, such issue shallrepresent their deceased parent, and stand in the same place, heor she would have done, if living, and shall be entitled to the (88)same part or portion of the estate of his or their uncle or aunt,as his or their father or mother would have been entitled unto if living,such part or portion to be divided," etc.
Now it seems to me to be certain, that if this Act has not been altered in this particular, (and I think I can show that it has not) Susan Cauble, the only child of Adam Clement, who had died in the life time of his sister Eve, can claim under it without dispute, the part or portion of her aunt's estate, to which her father would have been entitled if he had survived his sister.
I think that I have advanced one sure step in my argument, by showing that the abolition of the right of primogeniture among males, did not either expressly or impliedly produce any change in the principle of the canon of the right of representation. I will now proceed further to show, that the admission of females into the inheritance on an equality with males, did not have that effect. I will, however, remark in passing, that doubts having arisen as to the proper construction of the Act above referred to, in relation to the admission of half blood and parents into inheritances in certain cases, another act was passed at the next session of the General Assembly, in October of the same year, by which it was explained and corrected. A reference to this amending Act, (see Act of 1784, ch. 225, see 2 and 3 of the Rev. Code of 1820) will show that it did not touch the rule of representation. Females were admitted into inheritances upon an equality with males by the Act of 1795, (Rev. Code of 1820, ch. 435) by this simple recital and enactment: "Whereas, by the before recited Act, (referring to the Act of *Page 76 
1784, ch. 204) the inheritance of land and other real estate in fee simple, descends to males in exclusion of females, contrary to the policy of our government, "Be it enacted, etc., that all females shall be entitled to take by descent, equally with the males, share and share alike, according to the rules of descent upon males in the before recited Act; any law, usage or custom, to the contrary notwithstanding." The question upon the Act is, can it alone have the extraordinary effect of essentially changing by inference the principle of the rule of representation? (89) So far from it, I think that it expressly recognizes and confirms that principle. All females shall be entitled to take by descent equal with the males, share and share alike, according to therules of descent upon males in the before recited Act. If I have succeeded in proving, that according to the before recited Act, the principle of the rule of the right of representation remained unaltered, then I have proved that it remained unaltered by the amending Act of 1795. I think that I have thus established upon a firm foundation, the proposition which I proposed to demonstrate, that the principle of the English canon, on the right of representation, had been adopted in this State, and had not been abolished by our canons which destroyed the right of primogeniture among males, and the preference of males over females. There is but one other Act which affects the question, and an examination of that, will, in my opinion still further confirm my views. In the year 1808, the whole law of descents was taken into consideration by the Legislature, and was referred to a committee, the chairman of which was the late Judge GASTON, who had at that early day given indications of the eminence, in his profession, which he was afterwards destined to attain. The committee, through their chairman, made a report which it is necessary, for my purpose that I should give in full. "Mr. Gaston from the committee, who were directed to enquire into the expediency of amending the law of descents, reported that having assiduously examined the important subject referred to them, they find that the various Acts which have been passed to regulate the course of descents, are so replete with ambiguities, that it is difficult to understand the true meaning of the Legislature; whether it was designed to retain a preference in favor of the relations of the blood of the purchasing ancestor? Whether kindred on the part of the father were to have a prior claim to those of the mother? Whether the provision in favor of one-half blood over the other, did not apply to the whole blood also; whether the abolition of the distinction between males and females was confined to individuals or extended to stocks; and whether the provisions in favor of parents comprehended the case of (90) lands inherited by the intestate, are all questions on which the *Page 77 
most intelligent may differ, and which must occasion the most extensive litigation. Your committee, conceiving that certainty in the law of descents, is of the utmost importance, and of universal consequence, have been anxious to discover whence this ambiguity in the existing law has arisen, that endeavoring to remove it, they might avoid the cause by which it has been occasioned. They believe that all these errors have arisen from the Legislature having undertaken to define with minuteness, the cases which might occur, and having undertaken to make provision for each of them, instead of establishing certain plain and general principles, which might be susceptible of application in every instance. Your committee, strongly impressed with this belief, have conceived it their duty to attempt the framing of rules, embracing such principles; and in making such rules, they have been studious to conform as nearly as might be, to the existing law. The three first rules, it will be perceived, do not introduce any innovation in those which now prevail, and would be altogether unnecessary were it not for the advantage which is derived from bringing together all the rules upon the subject. The fourth rule has for its principal object the securing to the family of the man by whose industry the property was acquired, the enjoyment of such property in preference to those who have no consanguinity with him. The fifth rule is designed to embrace those cases, in which the intestate was himself the first purchaser, and in which reason dictates that his nearest relations shall succeed to his estate, whether on the side of his father or mother. The sixth rule is but a simple affirmation of principles now existing. The proviso is founded upon that sentiment of natural affection which has received the sanction of the Legislature in the two acts of 1784. The committee have deemed it advisable to avoid all uncertainty, that the proviso should embrace every case in which the collateral kindred are more remote than the issue of brother and sister, and to prevent the inconvenience which might result from interrupting the general course of descent, they have proposed that the provision should be for life only. Your committee, do therefore, recommend that the bill accompanying this report, entitled `a (91) bill to regulate descents,' be put on its passage, and enacted into a law." It was accordingly so done, and the bill became a law, and it is said without any amendment. (See note to Wilkerson v. Bracken,24 N.C. 322, and see the Act among the Acts of 1808, ch. 739, of the Rev. Code of 1820, constituting the first six sections of the Rev. Stat. ch. 38.)
The report says: "That the three first rules do not introduce anyinnovation in those which now prevail." The third rule is that which provides for the right of representation, and it is to be remarked, that it is substantially the same as the English rule on that subject. Indeed, *Page 78 
it is almost a verbatim copy of the English canon. The most astute of critics cannot say that leaving out of our rule the words in infinitum. and inserting the conjunction "and" instead of "that is," makes it different in signification from the English. The term "descendants" signifies "persons descended from an ancestor in any degree," and embraces grand-children, great grand-children, etc. as well as children. This is so, independently of the fourth section of the first Act of 1784, (Rev. Code of 1820, ch. 204) which extends the right of representation to lineal descendants further removed from their ancestors than grand-children, and to collaterals further removed than the children of brothers and sisters. Such being the case, I feel bound to adopt the construction put upon the English canon. I can hardly conceive it possible that the learned author of the report, and draftsman of the Act of 1808, should, in framing rules of descent for the express purpose of removing ambiguities and producing certainty, have used the very language of a pre-existing rule unless he intended that it should have the same signification. I feel bound to contend further, that such is the only natural and proper construction of which the language of the rule is susceptible. If the number of the descendants of several deceased persons be different, is it not obvious that those of any one of such deceased persons will not stand in the place of their ancestors, if they take with others percapita instead of per stirpes? For instance, if the propositus had two sons and a daughter, all of whom had died in the life time of (92) their father, leaving the first son, six children, the second one, and the daughter, ten; now, if upon the death of the grandfather, the grandchildren take per capita, the only child of the second son will get but a seventeenth part of the estate, instead of the third to which his father would have been entitled, had he survived his father, thepropositus. A similar instance would show a like operation of the percapita rule when applied to the descendants of collaterals. That, it seems to us, is in direct opposition to the plain import of the words of the rule, and we therefore, cannot adopt it.
The result of my argument, when applied to the case before us, is, that when Eve Clement died, her lands descended, one half to her niece, Susan Cauble, as the sole descendant of her deceased brother, Adam Clement, and the other half to her nieces and nephews, and the children of her deceased nieces and nephews, as the descendants of her deceased brother, Henry Clement, to be divided among them, per stirpes. In coming to this conclusion, I have not relied upon the authority of Ward v. Stowe,12 N.C. 67, because it is not directly in point, though the language of the Court favors the view which I have taken. Nor have I sought to sustain myself by the high authority of that eminent Judge *Page 79 
and distinguished lawwriter, Chancellor KENT, (4 Kent Com. 391,) because, with all due deference to those who entertain a contrary opinion, I think the argument upon these various provisions of our statutes is so clear, that it does not require it.
As the Chief Justice concurs with me, the decree must be reversed, the exception to the master's report overruled, the report confirmed and a decree be entered accordingly.
Decree reversed.