## STUBBS *v.* PITTS.

### Opinion delivered July 22, 1907.

1. TRUST—WHEN IMPLIED.—When a contract for the sale and purchase of land is entered into, and the relation of vendor and vendee is constituted, the vendor becomes a constructive trustee for the purchaser; and one who, with knowledge of such trust, pays the balance of the purchase money of such land and takes deed to himself will be held a trustee for the vendee and his heirs. (Page 168.)

2. HOMESTEAD—ABANDONMENT BY WIDOW—RIGHTS OF HEIRS.—As the widow is entitled to one-half of the rents of her deceased husband's homestead, where he left minor children, if she abandons the homestead, the right to the entire homestead thereupon vests in the minor children; but the fact that the widow has lost the right to recover her half of the rents and profits of the homestead by laches does not vest in the minor children the right to recover her half of the rents and profits except from the time when they have recovered possession of the homestead from the adverse holder, or the widow specifically abandoned the homestead. (Page 169.)

3. TRUST—STATEMENT OF ACCOUNT.—In decreeing a constructive trust against one who paid the purchase money for the vendee, and took deed to the land and possession thereunder, the trustee will be allowed credit for the purchase money paid, with interest, and the value of improvements made, and will be charged with the rental value of the land during the period of such possession. (Page 170.)

Appeal from Yell Chancery Court; *Jeremiah G. Wallace,* Chancellor; reversed in part.

### STATEMENT BY THE COURT.

This is an action in equity to establish the title of Nannie M. Pitts and her daughter, Gardie V. Stubbs, to an interest in 187 acres of land in Yell County, the legal title to which is in Mrs. V. E. Stubbs, the defendant in this action. The circumstances out of which the litigation arose are as follows:

In 1882 one William Stubbs purchased from John Main, of Missouri, 303 acres of land in Yell County, Arkansas. This land was in a part of the Arkansas River bottom known locally as "Carden's Bottom." The land was fertile, but subject to occasional overflows, and at that time not much improved. William Stubbs had no money, and purchased the land on credit, giving his notes to Main for the price, $2,100, with ten per cent. interest from date, and Main executed and delivered to him his written obligation to convey the land to him upon the payment of the purchase price. Stubbs took possession of the land under the contract, and commenced to improve it. But, when the purchase money notes became due, he was unable to pay them. In the meantime, his mother, Mrs. V. E. Stubbs, had received from her father's estate about $1,400. She agreed with her son and the agent of the vendor, Main, that she would purchase 116 acres of the land and pay therefor one-half of the purchase price that her son had agreed to pay for the whole tract, and that she would join her son in executing new notes for the remainder. The title bond was thereupon surrendered to Main, and he executed a quitclaim deed to Mrs. Stubbs for 116 acres of the land, and she paid him half of the purchase price. She or her son paid about $200 to Main on the price of the other part of the tract purchased by William Stubbs, and William Stubbs gave Main two notes for $425 each, with ten per cent. interest from date, for the balance of the price. These notes were signed by both William Stubbs and his mother, but she was only a surety to him, as he was the purchaser of that part of the tract. There is some evidence to show that, after the original title bond was returned to Main, he never executed another title bond, though that point is not very material, for the notes executed by Stubbs and his mother to Main recite that they were executed for the purchase price of the land, and give an accurate description of it.

On December 11, 1884, Stubbs paid one hundred and ninety dollars on one of these notes. He died in November, 1885, without making any further payments. At the time of his death he had made considerable improvements on the land, and had about 50 acres in cultivation. He lived on the land with his family, it being his home. Afterwards in January,

1896, Mrs. Stubbs, his mother, paid the remainder of the purchase money on the land, which the evidence shows was $880, and Main executed a quitclaim deed, conveying the land to her. The deed recites a consideration of $1,050.

After the death of Stubbs, his wife did not reside on the place again, which passed into the hands of Mrs. V. E. Stubbs, she claiming to be the owner by reason of the fact that she had paid the larger part, if not all, of the purchase money, and had received a deed from Main conveying the land to her. Since she took possession, she has had nearly all of it cleared and put in cultivation, and has had several houses and barns erected on it for the use of tenants, by reason of which its value has been greatly increased.

At the time of his death William Stubbs left two infant children. One of them, Mattie, a child by a former wife, was reared by Mrs. V. E. Stubbs, her grandmother, the other, Gardie Stubbs, was born only a few months before her father's death, and after his death lived sometimes with her grandmother and sometimes with her mother, who subsequently married one Pitts. Mattie Stubbs is now a married woman, her husband being one Lynch.

In March, 1905, Mrs. Pitts and her daughter, Gardie Stubbs, brought this action in the Yell Chancery Court for the Dardanelle District, in which they set out the facts stated above and alleged that the rents and profits received by Mrs. V. E. Stubbs from the 187 acres of land bought by Stubbs had more than repaid the money advanced by her to pay the purchase notes and interest thereon with costs of all improvements made by her, wherefore they asked that Gardie Stubbs and Mattie Lynch be declared to be the equitable owners of the land, subject to the dower interest of Mrs. Pitts, and that Mrs. V. E. Stubbs be compelled to account for the rents and profits received over and above the amounts expended by her. Mrs. Mattie Lynch, the married daughter, refused to join in this action, and was made a defendant. Mrs. Stubbs filed an answer, in which she denied that plaintiffs had any interest in the land, or that they had any right to require her to account for the rents and profits thereof.

On the hearing, the chancellor found in favor of the plain-

tiffs, and made a decree in which he held in effect that William Stubbs had his homestead on the land; that at the time of his death he had paid all the purchase money except $880; that this was paid by Mrs. V. E. Stubbs after his death; that the 'rents and profits had more than repaid this sum; that Mattie Lynch and Gardie Stubbs, daughters of William Stubbs, were in equity the owners of the land, subject to the dower interest of Mrs. Pitts; and that the plaintiffs were entitled to an accounting. He thereupon appointed a master to hear evidence and state an account. Gardie Stubbs at that time was not 21 years of age, and the chancellor appointed commissioners to lay off 160 acres of the land as a homestead, and to make partition of the land. On the coming in of the report of the commissioners and that of the master, the court proceeded to make a decree partitioning the land, declaring the rights of parties thereto, and also gave a personal judgment in favor of Gardie Stubbs against Mrs. V. E. Stubbs for over $3,500, and a judgment in favor of Mrs. Pitts against her for $120.34 and costs of the action, the costs of the partition being taxed against the plaintiff Gardie Stubbs. Mrs. Stubbs appealed.

*Brooks & Hays* and *Sellers & Sellers*, for appellants.

1. To establish an implied trust in land so as to authorize a court of equity to divest the legal title, the evidence must be clear, strong, full and satisfactory, and where parol evidence is resorted to to prove such a trust, it is received by the courts with great caution. 3 Pomeroy, Eq. Jur. § 1040; 15 Am. & Eng. Enc. of L. (2 Ed.), 1174; 11 Ark. 82; 27 Ark. 77; 44 Ark. 365; 48 Ark. 173; 64 Ark. 155; 41 Ark. 301; 75 Ark. 451; 76 Ark. 14.

2. Though infancy usually excuses from the defense of laches, lapse of time will subject his evidence to doubt and suspicion; and delay may cause the court to refuse relief. 50 Mich. 573; 25 W. Va. 179; 18 Am. & Eng. Enc. of L. (2 Ed.), 106; 43 N. Y. 222. Since females are of full age for all purposes at the age of 18, Gardie Stubbs, when this action commenced, was *sui juris*. Kirby's Digest, § 3756; 55 Ark. 97. And, to avoid the penalty of laches, should have acted promptly. 18 Am. & Eng. Enc. of L. (2 Ed.), 106. See 7 Words & Phrases, 5977, for definition of *"reasonable time."* Conscience, good

faith and diligence are required of the suitor who invokes the aid of equity. 120 U. S. 377; 68 S. W. 489; 12 Am. Dec. 367 and note; 54 *Id.* 130; Wood on Limitation, 148; 34 O. St. 463; 64 Ark. 345; 41 Ark. 303; 58 S. W. 672; 55 Ark. 92; 2 Dembitz, Land Tit. § 188; 139 U. S. 693; 23 Pac. 910; 146 U. S. 101; 8 How. (U. S.) 221; 10 L. R. A. 125; 35 Ark. 141.

No reason is shown why Mrs. Pitts and her daughter could not have sued twenty years since, when they knew appellant had bought the land, was treating it as her own, and was improving it. Equity will not enforce stale demands, where the party has been guilty of negligence, and has slept upon his rights. Wood on Limitation, 151; Buswell on Limitation, § 18; 14 Ark. 62; 19 Ark. 21; 43 Ark. 483; 58 Ark. 589; 33 Fed. 447; 28 Fed. 285; 18 Md. 130; 23 Am. St. Rep. 147; 67 Mo. 187; 47 Mich. 79; 2 Pomeroy, Eq. (3 Ed.), § 817; 123 Fed. 566. One who is chargeable *prima facie* with laches must allege and prove facts that excuse the delay. 33 Fed. 840; 46 Fed. 280; 115 U. S. 96; 12 Enc. Pl. & Pr. 836. See also 41 Ark. 303.

3. A resulting trust, from payment of the purchase money, can only be brought about when the deed is made, *i. e.*, the payment of purchase money and the execution of the deed must amount to one transaction. No subsequent payment of the purchase money will create the trust. 29 Ark. 612; 30 Ark. 230; 40 Ark. 62; 95 S. W. (Ark.) 146; 51 Am. Dec. 755; 9 Am. Dec. 264; 5 Johns. Ch. 1; 2 *Id.* 408. If it be said that Mrs. Stubbs paid the money for appellees, that would not create a trust. 40 Am. Dec. 238.

4. Appellees are barred under the doctrine of election and acquiescence. Wood on Limitation (3 Ed.), § 61.

Moreover, because of appellant's long possession and exercise of the rights and claim of ownership, she, under the policy of the law that favors certainty in titles, will be presumed to have a grant or conveyance of the land. 22 Am. & Eng. Enc. of L. (2 Ed.) 1289; 4 How. (U. S.) 289; 7 Wheat. (U. S.) 59; 120 U. S. 534; 52 S. W. 121; 52 Fed. 838; 85 Am. Dec. 145; 6 East, 208; 1 Camp. 463; 23 Pick. 141; 17 Wend. 562; 23 Barb. 473; 1 Greenleaf, § 47.

5. The court erred in its decree as to the mesne profits.

Kirby's Digest, § 2756. Minors are included in general laws unless specifically excepted, even in statutes of limitation. 53 Ark. 421.

Bullock & Davis, for appellees.

1. Deceased, W. B. Stubbs, was vested with an equitable estate of inheritance in the lands. Main, by virtue of the contract, was a trustee of an express trust, holding the legal title to the land in trust for Stubbs, his heirs and assigns, subject to the payment of the purchase money. 71 Ark. 164; 16 Ark. 122; 1 McClain, 132; 90 U. S. 119; 3 Pomeroy's Eq. (3 Ed.), § 1046 and note 2. A purchaser with notice of the trust, express or implied, becomes himself a trustee for the beneficiary with respect to the property, and is bound in the same manner as the original trustee from whom he purchased. 2 Pomeroy's Eq. (3 Ed.), § 688; 30 Ark. 249; 52 Ark. 331.

2. The proof is insufficient to sustain the contention that W. B. Stubbs rescinded the contract, or that it was discharged. His continuous possession of the 187 acres and cultivation and improvement thereof up to the time of his death disprove such intention on his part. Mere surrender of the title bond, or its delivery, with no intention of releasing his title, cannot be treated as a discharge, rescission or abandonment of his contract. 52 Ark. 381; 43 Ark. 203; 42 Ark. 170; 20 Cyc. 223. The presumption is, if he surrendered the title bond, it was done to meeet the changed conditions brought about by appellant's purchase of the 116-acre tract, and that it was with the intention of having another executed to him. Until a new instrument was executed, the old would be effective to protect his interest remaining. 1 Pomeroy, Eq. Jur. (3 Ed.), § 420. To establish a rescission of a written contract, the evidence must be clear and satisfactory. 52 Ark. 207. And such a contract may not be rescinded by parol. Clark on Contracts, 621; 9 Cyc. 599; 9 Ark. 488; 20 Cyc. 228; 130 Mass. 388; 20 Cyc. 221, note G; 96 Tex. 86; 97 Am. St. Rep. 871; 45 Fed. 332.

3. The parol agreement, if made, to convey to appellant, in the event Mrs. Stubbs, as surety, had to pay for the land, was void under the statute of frauds. Kirby's Digest, § 3654. Payments alone are not part performance, nor execution of notes for purchase money. 70 Ark. 351. Possession taken and im-

provements made after the death of W. B. Stubbs are not such part performance as will take the defense out of the statute. 41 Ark. 97; 66 S. W. 333; 21 Ark. 278.

Appellees are not barred by the statute of fraud, because Stubbs went into possession under a written contract, retained 187 acres when the contract was changed, and died in possession before maturity of all the notes, and after having made lasting improvements. 129 U. S. (32 L. Ed.) 673.

4. The plea of adverse possession can affect only the widow, Mrs. Pitts. The heirs have three years after reaching the age of 21 years in which to bring suit. Kirby's Digest, § 5056. And the homestead right of Gardie Stubbs had not expired. 53 Ark. 400.

The statute of limitation will not run in favor of the heirs against the widow's dower as long as the lands are in their possession. 33 Ark. 294; 29 Ark. 651; 40 Ark. 24; Scribner on Dower, 572. And they could not lay off her dower while it was held adversely to them. The statute does not run in favor of a trustee of an express trust. 44 Ark. 452; 43 Ark. 469; Id. 504; 20 Ark. 198. See also 52 Ark. 76; 46 Ark. 26.

5. There is no error in the decree as to mesne profits. 47 Ark. 458; 70 Ark. 489; 47 Ark. 528; 37 Ark. 316; 29 Ark. 633; 55 Ark. 369; 52 Ark. 381; 61 Ark. 26.

RIDDICK, J., (after stating the facts.) The contention of counsel for appellant is that when Mrs. Stubbs agreed to purchase and pay for 116 acres of the land and to sign the notes of William Stubbs for the balance due for the remaining 187 acres it was done with the further agreement between herself, the vendor, Main, and William Stubbs that the title bond executed by Main to William Stubbs for the conveyance of the 303 acres purchased by him should be surrendered to Main, and that, if William Stubbs failed to pay the notes at maturity, she should pay them, and that thereupon Main should execute a deed conveying the land to her, and that all interest in or right to purchase the land held by William Stubbs should terminate. They say that, in obedience to this contract, Mrs. Stubbs, after the death of William Stubbs, paid the purchase money notes on which she was surety, and received a deed from Main conveying the land to her, and that she thus became the absolute

owner of the land. This contention is based mainly on the
testimony of the defendant Mrs. Stubbs. She is not only an
interested party, but she is testifying to a matter that hap-
pened twenty years before, and where the other party to the
contract is dead. At the time she signed the notes of her son
for the purchase of this land, she no doubt had confidence in
him, and felt that, if she was compelled to pay for the land,
he would protect her in some way, and she may have believed
that, if she paid for the land, it would belong to her; but, when
the whole circumstances are considered, we are of the opinion
that the chancellor was justified in attaching little weight to
her testimony in reference to the oral contract above referred
to and in finding that there was no agreement on the part of
William Stubbs to the effect that, if he failed to pay for the
land, it should be conveyed to and belong to her on the pay-
ments of the notes by her. Having been compelled by the
death of her son to pay the notes for the purchase price of
the land which she had signed, she no doubt had the right to
hold the land for the re-payment of the money advanced, but
that did not divest the rights of his heirs in the land. Potts,
who was the agent of Main, and through whom the new con-
tract of purchase with William Stubbs was made, testified that
he remembered that the title bond was surrendered, and that
Mrs. Stubbs became the purchaser of a portion of the land, pay-
ing therefor in cash; that she agreed to assist her son, William,
to buy the remainder of the land, and signed the purchase money
notes for that purpose, but he did not remember that there was
any agreement that the land should be conveyed to her if she
had to pay for it. On the contrary, he testified that, after the
death of her son, she said to him that "rather than lose what
had been paid on the land she would take it up for the chil-
dren." Counsel for defendant say that she probably referred to
her own children, but it seems unreasonable to believe this.
The reference was to the children of the son, and tends to show
that she knew that these children still had an interest in this
land. The statement of herself and Potts, the agent of Main,
that at the time the deed was executed by Main to her they
thought there was no legal obstacle in the way of such a con-
veyance amounts to nothing, for it was only their opinion as

to the law, and does not show that the facts justified such belief. Besides, if she paid the money and took the deed to secure herself, there was no wrong in it, but she cannot hold the land after the money is paid.

There is no question that William Stubbs purchased this land and executed his notes therefor, which described the land and recited that they were executed for the purchase price of the land, and that his mother went his security, and afterwards paid the balance due on the notes, and received a conveyance of the land. These facts are established by the notes and other evidence beyond controversy, and constitute the only solid basis upon which to rest the decision in this case. Taking these as the facts, it is clear that at his death William Stubbs was in equity the owner of the land. The notes which describe the land and recite that they were given for the purchase money thereof, taken in connection with the undisputed evidence that he was the principal in the notes, that he took possession under his contract of purchase and made valuable improvements on the land, show that he had a contract for the conveyance of the land which a court of equity would enforce. "The moment," says Lord Hatherly, "that a contract for the sale and purchase of land is entered into, and the relation of vendor and vendee is constituted, the vendor becomes a constructive trustee for the purchaser." *Shaw* v. *Foster*, L. R. 5 H. L. 321 ; *Lysaght* v. *Edwards*, L. R. 2 Ch. Div. 499-506. This is founded on the principle that equity treats that as done that ought to be done. By the terms of the contract, the purchase price ought to be paid to the vendor, and the land ought to be conveyed to the vendee; equity therefore regards this as done. The consequences of this doctrine, says Prof. Pomeroy, are carried out. As the vendee holds the equitable estate, "he may convey or incumber it, may devise it by will; on his death, intestate, it descends to his heirs, and not to his administrators; in this country his wife is entitled to dower in it; a specific performance is after his death enforced by his heirs; in short, all the incidents of a real ownership belong to it." 1 Pomeroy on Equity, § 368. In commenting further on this doctrine the learned author says that it is a mistake to suppose that this doctrine does not apply until the purchase price is paid. It applies at once, so

soon as a valid contract of sale is made, though, until the purchase money is paid, it is a lien on the equitable estate of the vendee, and by the enforcement of this lien in a court of equity the equitable estate of the vendee may be sold or cut off. Note to § § 368, 1046, 1161, 1260, 1261.

Now, it is clear, as before stated, that William Stubbs had an equitable estate in this land that descended to his heirs. This estate was not lost by the conveyance to Mrs. Stubbs, for she knew all the facts, and took only the right of the vendor to hold the land as security for her debt. Equity therefore will compel her to convey the land upon the payment of the debt and interest. As she has taken possession of the land and collected the rents and profits, it is proper that she should account therefor to the heirs. There is no need to cancel the conveyance from Main to her, for equity can compel her to convey to the heirs or vest the title acquired by her in them so soon as the purchase money is paid.

The next question relates to the interest of these plaintiffs in the land. The chancellor held that William Stubbs had a homestead in the land, that Mrs. Pitts, the wife of William Stubbs, had lost her homestead interest in the land by abandonment, and that Mattie Lynch and Gardie Stubbs were entitled to a homestead in the land until they became of age, and that afterwards Mrs. Pitts, as against them, was entitled to a dower interest therein. In the opinion of a majority of the judges this decision of the chancellor was correct. But the fact that Mrs. Pitts has lost her homestead interest in the land does not vest the right to recover the entire rents thereof in the two children. After the death of a husband owning a homestead, his widow is entitled to the possession thereof; but, if there are minor children, she must share the rents and profits of the homestead with them until they arrive at age, she being in law entitled to half of the rents and the children to one-half. If the widow abandons or waives her homestead rights by some definite act, as by executing a deed thereto conveying the land to a third party, the right thereto vests in the children. But the mere fact that she has lost the right to recover her portion of the rents and profits through laches or the statute of limitations does not vest the right to recover them in the children

until they have recovered possession of the homestead from the adverse holder. In this case the widow never conveyed the land, and the only showing that she had acquired a new homestead is that she and her husband had a home in Conway where they had resided for a year. The only specific act of abandonment shown was that she had for a year previous to the time she testified lived at the home of her husband in Conway. The rights of the minors to the entire rents of the homestead could not have accrued before that time. It is true that the right of Mrs. Pitts to recover the rents and profits of the homestead from Mrs. Stubbs is now barred by laches. But, if Mrs. Stubbs had waived this defense, admitted her liability, and paid one-half of the rents and profits to Mrs. Pitts, the heirs could not have complained. For they had no right to the rents and profits of the widow's half until the widow had been guilty of some specific act of abandonment, or until they had recovered possession of the premises against the adverse holder. We are therefore of the opinion that the decree of the court that held that the minors were entitled to call Mrs. Stubbs to account for the full amount of the rents, without regard to whether there had been any specific act of abandonment of her part of the homestead by Mrs. Pitts, was erroneous. The court did not err in charging Mrs. Stubbs with the full value of the rents and profits due from the land as against the improvements and money expended by her in paying for the land, but, after the rents had paid the money paid by her and the value of the improvements, the minors can recover only one-half the rents of the homestead up to the time of the recovery of the land, or until Mrs. Pitts acquired a new home. The other half belonged to their mother, and is barred by statute of limitations.

The findings of the court that Mrs. Stubbs only paid $880 on the purchase price of the land is in our opinion against the weight of evidence. Mrs. Stubbs testified that she furnished her son about $200 or more to pay on this land. This evidence is not contradicted, and it is shown that she had money at that time, while her son was very poor, and told others that he could not pay the debt. Besides, the deed of Main to her recites a consideration of $1,050 paid by her. The payment of the purchase price of this land by Mrs. Stubbs has been the means of

saving a valuable piece of property for the heirs, and she deserves to have the full amount paid by her returned with interest, and we think the evidence shows that she paid at least the amount recited in the deed.

Five dollars per acre, the amount of rents charged against Mrs. Stubbs for the use and occupation of the place during the years she controlled the place, excepting the overflow years, seems to us excessive. According to the findings and decree of the court, Mrs. Stubbs took this tract of 187 acres of land in 1886, when there were only fifty acres cleared on it, and practically no other improvements excepting the fence, a small cabin and an old house boat, when very little of the purchase money had been paid, except that paid by her, and so managed it that after twenty years she had put nearly the whole of it in a high state of cultivation, erected three or four tenant houses, dug wells, and erected the necessary barns for the same, paid the taxes and repaid herself the money paid for the land, and saved over thirty-five hundred dollars for one of the heirs, nearly as much for the other, and over a hundred for the widow of her son. Besides this she reared, clothed and supported one of the children and the other one most of the time.

If it is true that Mrs. Stubbs has made all of these profits out of a small farm that was subject to occasional overflows, causing the fences to be washed away and requiring the expense of replacing them, she has certainly achieved a phenomenal success as a manager of a small farm, and deserves to be made a public guardian of small estates in that county. But in our opinion this result is another illustration of the fact that it is much easier to figure out profits on paper than to realize them by actual experience. Certainly, one that has been as successful as that should be allowed something for the loss of time, care and attention that she gave this place. The place would not have leased or rented itself or collected the rents, and it seems unjust after she has done this to charge her the full amount of the rent received by her without any allowance for the service she performed. The evidence tends to show that the rental value of this land was, when rented for long periods, $3.50 to $5 an acre, and we are of the opinion that four dollars an acre is as much as should have been charged against her.

It results from the conclusions reached by us that the account must be restated. The judgment is therefore reversed, and cause remanded with an order that the account be restated in accordance with this opinion.