1815.

NICHOLSON
v.
HALSEY.

*April* 15th.

NICHOLSON *against* HALSEY AND OTHERS.

Where the *legal* and *equitable* estates in land, being co-extensive, unite in the same person, the *equitable* is merged in the *legal* estate, which descends according to the rules of law.

Thus, if the *legal* estate in fee descend, *ex parte materna*, and the *equitable* estate in fee, *ex parte paterna*, the equitable estate is merged in the legal, and both go in the line of descent of the legal estate.

As where A. having paid money for the purchase of land, died before any con- veyance was made, and B., afterwards, took a conveyance of the land, in *trust*, for the infant daughter of A., to whom he, afterwards, executed a deed in fee, she was held to have acquired the *legal* estate by *purchase ;* and on her death, without issue, the estate descended to her brothers and sisters of the *half-blood*, to the exclusion of her *paternal uncle*.

Where a deed has been duly executed and delivered, a subsequent surrender' or destruction of it, will not devest the estate conveyed by it.

*THOMAS NICHOLSON*, (the brother of the plaintiff, *John*,) and *John Cantine*, now deceased, made a joint loca- tion on 4,132 acres of land in the township of *Chemung ;* and before they obtained the patent, *Nicholson* died, the 4th of *January*, 1792. A patent was, afterwards, issued to *Can- tine* for the lot No. 122., containing 4,000 acres, one moiety of which he held as trustee for the heirs of *Thomas Nichol- son*, deceased, who died intestate, without issue, leaving his wife *Rebecca*, *enseint* of a female child, born in *May*, 1792, and named *Eliza Bradner*. Before the 19th of *November*, 1792, *Cantine*, by an agreement with the widow, conveyed to her infant daughter, *Eliza Bradner*, in fee, two parcels of 1,640 acres, and 410 acres, making together about one half of the lot so held in trust by him. By the advice of *John Nicholson*, father of *Thomas Nicholson*, deceased, and of *Benoni Bradner*, father of his wife, and with her con- sent, the deed was given up to *Cantine*, and is lost or de- stroyed ; and, instead thereof, *Cantine*, on the 19th of *No- vember*, 1792, conveyed to the infant daughter, in fee, for

1815.

the consideration of 750 dollars, 1,640 acres, part of lot No. 122, in *Chemung ;* and on the same day conveyed to the widow 410 acres, parcel of the same lot, in fee, for the consideration of 250 dollars.     The widow of *T. N.,* deceased, intermarried with *Z. Halsey,* by whom she has had five children, all infants, and who are made defendants by their guardian. The infant daughter of *T. N.* died the 29th of *January,* 1811, intestate, and without issue, leaving the plaintiff, her eldest uncle, in the paternal line, and as he alleged in his bill, entitled by right to the inheritance of the said *Eliza B.,* deceased.     The plaintiff stated, that he apprehended that, in consequence of the irregular proceeding of *Cantine,* the plaintiff's succession to the estate was impeded, and that the same may have descended at law to the children of *Rebecca,* by her second husband, being the brothers and sisters of the infant *Eliza,* deceased, of the *half-blood.*     That *Thomas Nicholson,* in his lifetime, purchased of one *Bell,* lot No. 26., in *Romulus,* containing 600 acres, for which he paid 150 dollars, and took a conveyance in fee ; that *Bell* having, afterwards sold the lot to *Wm. Thompson,* and a dispute arising between the infant *Eliza* and *Thompson,* as to the land, *Thompson,* for the consideration of 100 dollars, executed a release to her of all his claim to the lot. The plaintiff charged that the wife of *T. N.* received of the personal estate of her husband 1,500 dollars, a sum beyond all the property she brought on her marriage.

The defendants, in their answers, alleged, that the lands in *Chemung,* and the lot in *Romulus,* were purchased with the proper money of *Rebecca,* the wife of *T. Nicholson,* advanced to her by her father, before her marriage, and not with the property of her husband, who left no estate, except a bond of 400 dollars ; that the substituted deeds were given in order that she might have a part, and under a verbal promise of indemnity to *Cantine ;* and they insisted, that, notwithstanding those deeds, the infant daughter of *T. N.* continued seised in fee of the whole 2,050 acres, and that the inheritance de-

scended wholly to her brothers and sisters of the half-blood. That two of the *Onondaga* commissioners, on the 10th of *September*, 1800, adjudged that the title in lot No. 24., in *Romulus*, was in the infant *Eliza B. Nicholson*. That the lot was granted to one *Sampson*, a soldier, the 9th of *July*, 1790, who sold the lot to *Thompson*, the 14th of *December*, 1791, who released on the 2d of *April*, 1799, to the infant. That her father purchased the lot of one *Bell*, who obtained a conveyance from *Sampson*, dated the 26th of *March*, 1784, when *Sampson* was an infant, and under age; so that the title of *Nicholson* was not valid in law; and that *B. Bradner* purchased the title of *Thompson*, for the use of the infant, and obtained the award of the commissioners in her favour. That the debts of *T. Nicholson*, at his decease, greatly exceeded his estate, and that the widow had never received any thing for what she brought him on her marriage.

<div style="float:right">1815.<br>NICHOLSON<br>v.<br>HALSEY.</div>

*Gold*, for the plaintiff, contended, 1. That *Thomas Nicholson*, having paid for a moiety of the lot in *Chemung*, was entitled to a conveyance; and, on the day of his death, was vested with an equitable estate in such moiety, subject to the same law of descents as a legal estate. (2 *Powell on Cont.* 56. 3 *P. Wms.* 211. 1 *Eq. Cas. Abr.* 175. pl. 5. 10 *Mod.* 515. 2 *Vern.* 679. 2 *P. Wms.* 629. 1 *Vern.* 298. 471.)

2. That if moneys, as alleged, had been advanced to the wife of *T. N.* by her father, as her marriage portion, they were received by him, in virtue of his *marital rights;* and, if vested in the lands in question, created no lien in favour of the widow, but the land descended to the heirs of the husband, as though the legal title had been vested in him at the time of purchase. (2 *Powell on Cont.* 93, 94. 2 *Vern.* 20. 322. *Sugden's Law of Vend.* 427. 2 *Eq. Cas. Ab.* 138. pl. 5.)

3. That the destruction of the deed to the infant, and the subsequent deeds, were unauthorized, and could not alter or

1815.   change the nature of the intestate's equitable estate, or pre-
NICHOLSON   judice the rights of the plaintiff as his heir.
v.          4. That the 100 dollars paid to *Thompson*, for his claim,
HALSEY.   to quiet the title, was not the consideration of an original pur-
chase, and cannot affect the title of *T. Nicholson*, which, ac-
cording to the evidence, was a valid legal title ; or if it were
questioned, an issue should be directed to ascertain its vali-
dity at law.

    *Henry*, contra, contended, 1. That by the execution of the
trust, the legal and equitable titles were united, and the trust
merged in the legal estate : and, 2. That the court will not
open the descent, so as to separate the legal and equitable
estate, and alter the course of descent.   This is an attempt,
by a collateral relation, to deprive the half-blood of their
right.   The father did not die seised, for no legal estate had
passed.   The state could not be a trustee by implication.   No
person stood seised in trust for him.   After his death the
patent for the lot issued, and then *Cantine* became seised of
the moiety in *trust* for the daughter, *en ventre sa mere*.   The
trustee conveyed this moiety, *in fee*, to the infant, the *cestuy
que trust*.   She was, then, seised in fee, and the fee could
not be devested by the destruction of the deed, without her
assent.   The subsequent deeds were mere nullities.   The
trust was *executed* by the first conveyance, and the rights of
the daughter were vested and fixed in her as a *purchaser ;*
and having the estate as a purchaser, and not by descent or
gift from her father, there could be no doubt on the case.
(*Cruise's Dig.* tit. *Descent*, ch. 3. s. 49, 50.   *Goodright* v.
* S. C. 3 *Ves.*   *Wells, Doug.* 771.*)
jun. 339.
    Admitting that the purchase money came from the mater-
nal grandfather, yet the defendants would have the superior
equity.   If not, yet, as heirs, their equity was *equal ;* and
having the legal estate, this court will not disturb them.
(2 *Vernon.* 578.)

As to the lot in *Romulus*, the deed from *Thompson* was direct to *Eliza B. Nicholson*, who thereby became a *purchaser*. But if *Thompson* had no title which he could convey, then she took by descent; and the plaintiff, having a complete remedy at law, cannot come to this court for relief.

*Gold*, in reply, insisted, that *Cantine*, having received the money, was a trustee in the lifetime of *T. Nicholson*, and that equities decend as real estates; that the state could be a trustee, as where a contract was made with the land-office, and part of the purchase money paid before the patent issued; and a *mandamus* would lie to compel a conveyance on completing the payment. The equitable estate descended to the infant daughter of *T. Nicholson*, who was entitled to the deed from *Cantine* on no other ground than as the *heir* of her *father*. The case of *Goodright* v. *Wells* was distinguishable from the present. It is impossible to say that the estate is not *derived* from *T. Nicholson*. The case is, then, within the spirit and meaning of the fourth canon, in the statute of descents. (*3 Cruise's Dig.* 401. tit. 29. c. 3. s. 54. 56, 57.) An equitable estate will be supported at law. (*3 Johns. Rep.* 216. *Foote* v. *Colvin.*)

This court has jurisdiction in cases of lost or suppressed deeds; and where the court has acquired jurisdiction for the purpose of discovery, or otherwise, it will retain the suit, in order to do complete justice between the parties, and to prevent useless litigation. (*Coop. Eq. Pl.* 28. *2 Johns. Cas.* 424.)

THE CHANCELLOR. This is a claim to the inheritance made by the paternal uncle of *Eliza B. Nicholson*, against her brothers and sisters of the half-blood.

The statute of descents says, that brothers and sisters of the half blood shall inherit equally with those of the whole blood, unless the inheritance come by descent, devise, or gift, of some ancestor of the person dying seised, in which

*1815.*

NICHOLSON
v.
HALSEY.

case all who are not of the blood of such ancestor are ex-cluded.

*Eliza B. Nicholson* died in infancy, seised in fee of a moiety of 4,000 acres of land in *Chemung*, and of the whole of lot No. 24., in *Romulus*.

The testimony is conclusive, that *John Cantine*, in his lifetime, conveyed to her the moiety of the *Chemung* lands. This conveyance was afterwards delivered back to *Cantine* by her mother, and new deeds taken to the infant and her mother, of the same lands, in separate and unequal portions. The first deed is supposed to have been destroyed after it was delivered up, and it cannot now be found. This subsequent surrender and destruction of that deed could not devest the infant of the estate of which she was seised under that deed, and she must have transmitted, by descent, her interest in the same, unimpaired, to her heirs at law. This is a clear and undeniable proposition; and as she is to be considered as having acquired the legal estate by purchase, the question is, whether this court can now, in aid of the heir, *ex parte paterna*, take notice of the equitable title to those lands which she inherited from her father, and which was afterwards united with the legal estate by means of the conveyance from *Cantine?* It may be laid down as a settled principle, that when the legal and equitable estates (being co-extensive) unite in the same person, the equitable estate is merged in the legal, and may be said no longer to exist for the purpose of being recognised and acted upon by this court. The legal estate is left to prevail according to the rules of law. The existence and truth of this principle has been frequently declared both in courts of law and equity. Thus, in *Goodright* v. *Wells*, (*Doug*. 771.,) it was acknowledged, that if the legal interest decend in fee, *ex parte materna*, and the equitable interest in fee, *ex parte paterna*, the equitable estate merges in the legal, and both follow the line through which the legal estate descends; and the court held, that after such union, the legal

and equitable estates should not open on the death of the person so seised, and be severed for the claim of different heirs. The judges said, there was no such case in law or equity, and there was no reason for it; for the moment both estates met in the same person, there was an end of the trust, as a man could not be a trustee for himself. And, to use the language of Lord *Mansfield*, "why should the estates open at his death? What equity has one set of heirs more than the other? The legal estate draws the trust after it, and the latter is not to be revived so as to make the heir at law of one denomination a trustee for the heir at law of another denomination, who would have taken the equitable estate, if that and the legal estate had not united. There is no room for *chancery* to interpose, and the rule of law must prevail."

The case of *Doe* v. *Putt*, cited from the C. B., was considered, by the K. B., as having established the same doctrine, and to have ruled that the *cestuj que trust*, taking the legal estate from the trustee, as a purchaser, thereby altered the course of descent.

The principle advanced in the case from *Douglas' Rep.* was afterwards sanctioned by Lord *Thurlow*, in *Wade* v. *Paget*, (1 *Bro.* 364.,) and by the Master of the Rolls, in *Philips* v. *Brydges*, (3 *Ves.* 126, 127.,) and again, in *Selby* v. *Alston ;* (3 *Ves.* 339. ;) this last case arose on a bill by the paternal heir, claiming the estate as heir of the equitable title, against the heir on the maternal side, who was in possession, and claimed as the heir to the legal estate. The case is much in point, and presses strongly on the one before us. The court there held, that after the union of the equitable and legal estates in the same ancestor, the former was absorbed and gone ; and the bill was dismissed because the paternal heir had no equity.

The plaintiff, then, under the authority of these cases, and the principle which they so clearly and so rationally establish, was no claim to the assistance of the court in respect to the *Chemung* lands. There can be no doubt that the

1815.

NICHOLSON
v.
HALSEY.

infant *cestuy que trust*, by means of the conveyance from *Cantine*, the trustee, took the legal estate as purchaser; and, consequently, if the legal and equitable estate, so united by that purchase, were not, afterwards, severed and revived by her own act, and cannot be considered as opening at her death, she must have transmitted the entire inheritance by descent to her brothers and sisters of the half-blood.

With respect to the military lot, a single observation appears to me to be sufficient.

If the title to the lot was in *Thompson* when he conveyed to the infant, she took as a purchaser, and the title descended to the defendants, as her heirs at law. But if the title was not in him, and had been previously acquired by her father, then she took by descent, and the plaintiff has a clear title at law, as her heir, to the exclusion of the half-blood, and there is no cause shown for calling in the extraordinary aid of this court. There is no allegation in the bill of any special ground for coming here to assert a dry legal title.

In every view which I have been able to take of this case, I think the plaintiff fails; and his bill must be dismissed, with costs.

                                        Bill dismissed.