HILL *v.* HEARD.

Opinion delivered May 20, 1912.

1. DESCENT—EQUITABLE ESTATE.—The equitable estate of a vendee under a bond for title, upon his death, descends to his heirs, and not to his administrator. (Page 26.)

2. SAME—MERGER OF LEGAL AND EQUITABLE ESTATES.—Where the legal and equitable estates in land come through different channels and in different modes, it is the course of the legal, rather than the equitable, estate which determines whether the estate of the holder is ancestral. Thus, where the legal title is acquired by purchase, and the equitable title by inheritance, the descent of the property will be cast as an estate which came by purchase. (Page 27.)

3. SAME—NEW ACQUISITION.—Where a father purchased land, taking bond for title, and paid one-fourth of the purchase money, and the remainder of the purchase money was paid by the mother; and deed was taken in name of the son, the equitable estate which descended to the son merged into the legal estate, and, upon the son's death, did not descend to the son's paternal grandmother, the nearest kin on the father's side, but to his brothers and sisters of the half-blood on the mother's side. (Page 31.)

Appeal from Conway Circuit Court; *Hugh Basham,* Judge; reversed.

*Sellers & Sellers,* for appellant.

1. The finding that all the purchase money except the first payment was "from proceeds of personal property of the estate—the proceeds of a small piece of land of the estate sold by the administrator for that purpose, and the rents and profits of the land in controversy," was wholly unsupported by the evidence. The testimony of Heard, if true, does not prove the finding. Heard is contradicted by the circumstances, and his testimony, being as to transactions with a person now dead, is suspicious and unreliable. 17 Cyc. 808; 21 How. (U. S.) 493; 45 Am. St. 94; 53 Mo. 385; 111 Iowa 303; 12 La. Ann. 401; 14 *Id.* 275; 37 *Id.* 873; 46 Mo. 423.

2. A payment out of the rents was not a payment out of the estate. The rents belonged to the widow and child. Kirby's Dig., § 3882; 34 Ark. 71; 42 *Id.* 515; 92 *Id.* 145.

3. The land was a new acquisition by James M. Heard. Walker's Am. Law, (11 ed.), 409; 1 Johnson's Ch. (N. Y.) 417; 14 Cyc. 28; 18 Oh. St. 312-343; 65 Am. St. 793-6; 25

Am. Rep. 317; 70 S. W. 288; 78 S. W. 899; 3 Johns. Ch. 53; 5 N. J. Eq. 9; 62 *Id.* 1; 83 Md. 279; 69 Oh. St. 366; 28 Ind. 74; 3 Cruise on Real Prop. title 29, descent ch. 3, §§ 32, 3 p. 337; 15 R. I. 204; 8 Johns. Ch. 416; 40 Conn. 449; 36 Cal. 329; 107 Ind. 410; 12 B. Mon. 169; 105 N. W. 625; 45 Oh. St. 89; 1 Johns. Ch. 416; Douglas 771; 3 Ves. Jur. 338; 50 Oh. St. 525; 57 *Id.* 244; 64 *Id.* 1; 65 *Id.* 448; 7 Fla. 172; 1 Dembitz, Land Titles, § 36; 2 Wash. Real Prop. (6 ed.) 476; 66 Ark. 309; 1 Steph. Com. 218; Coke Litt. No. 51; Black, Law Dict. 436; 135 S. W. 348. To constitute a gift from parent to child an ancestral estate, the consideration must be that of blood only. 58 Oh. St. 654; 49 N. E. 479; 65 Am. St. 793, and cases *supra.*

4. The legal title of the brothers and sisters of James M. Heard should not have been divested until they were made parties. 59 Ark. 187.

*Douglas Heard* and *Wm. L. Moose,* for appellee.

1. The title of James B. Heard was not a mere chattel interest, but real estate; an estate of inheritance, and at his death it descended to his infant son, subject to the widow's dower and homestead and incumbered only by the lien for the unpaid purchase money. 66 Ark. 170; 84 *Id.* 37; 13 *Id.* 533; 14 *Id.* 628; 16 *Id.* 122; 87 *Id.* 502; 93 *Id.* 375.

2. The estate was ancestral. 15 Ark. 555; Kirby's Dig., § 2645; 19 Ark. 396; 15 *Id.* 275; 31 *Id.* 103-5; 98 *Id.* 93.

3. Brothers and sisters of the half-blood can not inherit in this case. Kirby's Dig., § 2647. The inheritance came by descent.

4. There was no defect of parties. Kirby's Dig., § 6011.

FRAUENTHAL, J. This is an action of ejectment instituted by appellee for the recovery of a tract of land situated in Conway County. It is conceded by both parties to this suit that the land was owned by one James Montgomery Heard (who, for brevity, will be hereafter referred to as Montgomery Heard), who died intestate and without issue, leaving his mother as his only surviving parent, who also died prior to the institution of this suit. The appellee claims that the land was an ancestral estate, coming to said Montgomery Heard on the part of the father, and that she inherited it from

him by reason of the fact that she is his sole surviving paternal grandparent. The appellant claims that the land was obtained by Montgomery Heard as a new acquisition, and that the title passed to his half-brothers and half-sisters, who are appellant's children.

The land was purchased by James B. Heard in January, 1894, from one Richard Brooke, at the price of $1,550, for which he executed four notes for the sum of $387.50 each, due respectively on the first day of January, 1895, 1896, 1897 and 1898. At the same time, Brooke executed to him a bond for title, by which he agreed to convey said land to him by deed upon the payment of said notes. Under said purchase, Heard went into possession of and occupied said land as his homestead until his death, which occurred on May 28, 1895. He died intestate, leaving surviving him his widow, Edna, and one child, the said Montgomery, who was then from three to four months old. In April, 1897, the widow, Edna, married the appellant, Robert L. Hill, by whom she had six children. Montgomery Heard died intestate and without issue in September, 1908, and his mother died in September, 1911. There is a conflict in the testimony relative to the question as to who paid the various notes executed by James B. Heard for the purchase money of the land. The testimony upon the part of the appellee tended to prove that the first maturing note was paid by the maker in his lifetime, at or about its maturity, and that the other three notes were paid after his death by his widow, Edna, out of moneys derived partly from some personal property left by the said James B. Heard, and from a tract of land also left by the said intestate, which brought $150, and principally from the rents and proceeds of the crops made upon the land in controversy by the widow and those working for her. The testimony on the part of the appellant tended to prove that the last note was paid by the appellant out of his own money. But this testimony also tended to prove that he collected rents and profits of the land during the year in which he made the payment, which amounted to as much as said note. Upon the payment of the last note, the vendor, Brooke, in November, 1897, executed a deed by which he conveyed the land to said Montgomery Heard.

The case was tried by the court sitting as a jury, who found that the land was an ancestral estate coming on the part of the father to said Montgomery Heard, and that, upon his death without issue and the death of his mother, the land ascended to his paternal grandmother; and judgment was entered accordingly.

The sole question involved in this case for determination is, what was the character of the estate acquired by Montgomery Heard in this land—that is, was it ancestral or a new acquisition? If it was an ancestral estate, coming by the father, then, upon the death of the said Montgomery intestate and without issue and the termination of the homestead interest of the mother by her death, the land ascended to his grandmother in the line of his father in exclusion of his brothers and sisters of the half-blood. On the other hand, if the land was a new acquisition, then, upon the death of said Montgomery and his mother, the land passed by descent to his brothers and sisters of the half-blood. Kirby's Dig., § § 2645-7; *Kelly's Heirs* v. *McGuire,* 15 Ark. 555.

When the father, James B. Heard, purchased the land from Brooke and obtained from him a bond for title, he acquired an equitable estate in the land. The legal title to the land, however, was still in the vendor. The equitable estate thus obtained by a vendee is such an interest in land as will, upon his death, descend to his heir. As is said in 1 Pomeroy on Eq. Juris., § 368, in speaking of the interest which a vendee under a bond for title obtains in land: ''He may convey or incumber it, may devise it by will; on his death, intestate, it descends to his heirs, and not to his administrator.'' *Stubbs* v. *Pitts,* 84 Ark. 160. It follows that, upon the death of said James B. Heard, the equitable estate in this land passed by descent to his sole child and heir, the said Montgomery, subject to the homestead rights of the widow and of himself as minor. Thereafter, Montgomery obtained the legal estate and title to the land by virtue of the conveyance executed to him by the vendor, Brooke. The question then arises as to how Montgomery obtained this legal title—whether by or on the part of his father, or by purchase; and if by purchase, then the question recurs, what was the character of the estate which he then acquired when the equitable title

and legal title to the land were thus united in him, the one by inheritance and the other by purchase? Was the land thus acquired ancestral or a new acquisition?

In the case of *Kelly's Heirs* v. *McGuire, supra,* the entire subject of the descent of real estate as fixed by our statute was fully discussed and considered. The construction placed upon our statute of descents by that decision has been uniformly followed by this court, and the decision has become a rule of property. In considering the provision of the statute relating to ancestral estates, it was there said that its manifest intention was to preserve ancestral estates in the line of the blood from whence they came. In speaking of this provision the court said: ''It was a partial adoption or recognition of the common law principle which invariably followed the line of the blood." It has been the policy of our law as evidenced by statutory enactments to get away from the rules and canons of the common law relative to the descent of property. But the provision in our statute of descent relative to ancestral estates seems to have preserved to some extent a portion of such rules. At common law after a failure of lineal descendants of the last owner, the land, on account of feudal reasons, passed to his collateral relations, provided they were of the blood of the first purchaser by whom the land came to the intestate. 2 Blackstone, 220; 2 Tiffany, Real Property, § 432. So, by this provision of our statute, if the land came to the intestate by gift, devise or descent from an ancestor, it shall pass to such kindred only as are of the blood of the ancestor by or on the part of whom it was derived by him. In speaking again of this provision of the statute of descent relating to ancestral estates, this court in the case of *West* v. *Williams,* 15 Ark. 682, said that, in order to carry out the intention of the Legislature to preserve such estates in the line of the blood, ''the same means must be resorted to that were used at common law to make it effectual as to descended estates." It will thus be seen that, in the interpretation of this section of the statute of descent, the court recognized it as a partial adoption of common law principles, and considered it according to the rules of the common law relating to such succession.

In order, therefore to determine what is the rule of

succession when the legal and the equitable estate in land come from different channels and unite in the same person, we should resort to the same source for the interpretation of this phase of the statute. According to this, the descent of land is controlled by the legal title. The character of the estate in the holder, therefore, is determined by the course of the legal title coming to him. The leading case on this doctrine is *Goodright* v. *Wells,* 2 Douglass, 771, which was tried before Lord Mansfield, and in which it was held that "if the legal interest in land descend in fee simple and *ex parte materna* and the equitable interest in fee simple *ex parte paterna* or *vice versa,* the equitable estate shall merge in the legal, and both follow the line through the legal estate descended." The doctrine thus announced has been followed in this country. In the case of *Nicholson* v. *Halsey,* 1 Johns. Ch. 417, Chancellor Kent held that "where the legal and equitable estates in land, being coextensive, unite in the same person, the equitable is merged in the legal estate, which descends according to the rules of law." In that case A, having paid money for the purchase of land, died before any conveyance was made, and B afterwards took a conveyance of the land in trust for the infant daughter of A, to whom he afterwards executed a deed in fee, and it was there held that she acquired the legal estate by purchase, and, on her death without issue, the estate descended to her brothers and sisters of the half-blood to the exclusion of her paternal uncle. In Walker's American Law (11 ed.) 409, the author says: "In determining what is ancestral property, the legal title controls. It is paramount to the equitable title. Thus, if the legal and equitable title come by separate channels to unite in the same person, the latter is merged in the former, and follows the course of descent that an exclusively legal derivation would have dictated." In 27 Am. & Eng. Enc. Law (2 ed.), 303, the rule is thus stated by the writer of the article therein, and this rule appears to be well sustained by the authorities there cited: "Where the legal and equitable estate in the land come through different channels and in different modes, it has been held that it is the course of the legal rather than the equitable estate which determines whether it be an ancestral estate in the holder." *Selby* v. *Alston,* 3 Ves. Jr. 339; *Wells* v. *Head,* 12 B. Mon. 166; *Shepard* v. *Taylor,*

15 R. I. 204; *Holme* v. *Shinn*, 62 N. J. Eq. 1; *Stembel* v. *Martin*, 50 Ohio St. 495; *Russell* v. *Bruer*, 64 Ohio St. 1. In the case of *Higgins* v. *Higgins*, 57 Ohio St. 239, the principle as to the determination of the succession of land wherein the legal and equitable titles have come to an intestate from different sources is thus stated: ''In determining questions as to descent of real property, regard is had to the legal title only, and where the legal title is acquired by purchase and an equity in the property by inheritance, the legal title and equitable interest at once unite, and, upon the death of the owner, the descent of the property will be cast as an estate which came by purchase.'' In that case John Higgins agreed to sell to James Higgins 200 acres for $6,000, to be paid in installments, and deed to be made on payment thereof. Possession was delivered to the vendee, who afterwards died, leaving a widow and infant child named Darlton, and also brothers and sisters. Afterwards the court required John Higgins to execute a deed to the said Darlton on payment of the balance of the purchase money, amounting to $2,000. Darlton thereafter died intestate and without issue, and it was there held that the land which he had thus obtained was a new acquisition and descended accordingly. See *Hogan* v. *Finley*, 52 Ark. 55; *Wheelock* v. *Simons*, 75 Ark. 19. In the case of *Kelly's Heirs* v. *McGuire, supra*, it was definitely determined when land was ancestral and when a new acquisition, but the consideration there was only of legal estates. It was there said that when land comes by gift, devise or descent, either mediately or immediately, from the father or mother or from any person in their respective lines, it is an ancestral estate; and where the land is acquired by the intestate by his own exertions and industry, or is derived from any other source than descent, devise or gift from father or mother, or any relative in the paternal or maternal line, then it is a new acquisition. It has, however, been held by this court that, in order to constitute land an ancestral estate, it is not necessary that it come directly from the ancestor by deed or gift; it is sufficient to make the land ancestral if the ancestor advances the entire purchase money and takes the deed in the name of his son. In the case of *Galloway* v. *Robinson*, 19 Ark. 398, it was held that ''where the father advances the money for the purchase of

land and takes the deed in the name of his son, upon the death of the son without issue, the land vests in the father in fee. In such cases, the land goes to the son on the part of the father by gift, and was not a new acquisition by the son within the contemplation and meaning of the act of descent and distribution of estates;" and this ruling was recognized and followed in the case of *Cotton* v. *Citizens Bank,* 97 Ark. 568. See also *Magness* v. *Arnold,* 31 Ark. 103. But in all these cases the legal title came from or on the part of the father, and with no consideration other than that coming from him. In the case at bar only the equitable title came from the father, and the entire consideration for the land did not come from him. If the entire purchase money had been paid by the father or had been paid by his administrator out of his property, then, under the principle of the above cases, the land would have come to the son by or on the part of the father. *Frick Coke Co.* v. *Longhead,* 203 Pa. St. 168. However, in this case the legal title came to the intestate, Montgomery, from Brooke, and if any substantial portion of the purchase money of the land came from any source other than from the father, the land did not come by or on the part of the father to him. In such event the equitable and legal title came to the son, Montgomery, by different modes and through different channels; the land came partly by a title and consideration derived from a source other than by descent to the son from the father. The land was the homestead of the father, and, upon his death, the rents and profits arising therefrom became the property of his widow and minor child. Kirby's Digest, § 3882; *Gainus* v. *Cannon,* 42 Ark. 503; *Smith* v. *Scott,* 92 Ark. 143. If it it should be held that the rents of the land coming to the minor son were derived from the father, still the rents acquired by the widow became her separate property. The widow also became the owner of a portion, if not all, of the personal property left by the father. These rents and this personal property which came to the widow from the estate of James B. Heard become her absolute and separate property; and when this property of the widow, or the proceeds thereof, were paid on the land for the benefit of the son, it came to the son, not from the father, but from the mother. According to the undisputed evidence, the rents and personal property

which were thus owned by the mother were used in paying a great portion of the purchase money of this land; this portion of the consideration of the land came from a source other than from the father to the son. It follows, therefore, that the legal title to the land came to the son from a source other than from the father, and also that a substantial part of the consideration for the land, according to the undisputed evidence, came from a different source. In the case of *Martin v. Martin*, 98 Ark. 93, we said: "In order to constitute a gift from a parent to a child an ancestral estate within the meaning of our statute, the conveyance must be made entirely in consideration of blood and without any consideration deemed valuable in law; and if such deed is executed partly for a valuable consideration, the estate acquired is a new acquisition." In like manner, in order for the land to be ancestral in coming by descent from 'the father, it must come wholly from the father and without any pecuniary equivalent from any other source. If it comes in any other way, whether by purchase or gift, from a source other than from the father, then it is not an ancestral estate, but a new acquisition.

In the case at bar, one-fourth of the consideration for the land was paid by the father; after his death, three-fourths of the purchase money was paid; and a great portion thereof was paid by the mother and out of her separate property. This portion of the consideration did not come to the son by descent on the part of the father or through his estate, but came to him from the mother and out of her separate property. The legal title obtained by the son from the vendor was acquired by a consideration obtained from a source other than from the father, and, therefore, by purchase and not by descent. The two estates which thus united in the son came by different rights, the equitable estate by inheritance and the legal estate by purchase. The equitable estate, therefore, merged into the legal estate, and the rule of succession to the land must be determined solely by the source of the legal estate. The legal estate was not obtained by descent but by purchase, and the land acquired by the said Montgomery was, therefore, not ancestral but a new acquisition. It follows that, upon the death of said Montgomery

intestate and without issue, and the termination of the homestead right by the death of his mother, the land descended to his brothers and sisters of the half-blood. The court erred in the judgment which it rendered. The judgment is accordingly reversed, and this cause is remanded for a new trial.