CHASTAIN v. LARNEY et al.

No. 18301. Opinion Filed Dec. 4, 1928.

J. B. Campbell, Pryor & Stokes, and Criswell & Billingsley, for plaintiff in error.

Neff & Neff, for defendants in error.

HALL, C. This action or controversy involves the devolution of the estate of Nellsie, a Seminole Indian. The devolution is on a second cast of an "ancestral estate." The Arkansas law governs the descent.

Nellsie had one full brother, whose name was Tom Chotkey. Their mother was Cho Chee, and their father was Parhose. Nellsie had a half-brother named Alma Chotkey, whose mother was Cho Chee and whose father was some other Indian or person than Parhose. Of these three children Nellsie died first, in the year of 1902, and Tom Chotkey, her full brother, died about one year later. Alma Chotkey, the maternal half-brother, is still living. Cho Chee, the mother of these three children, died at about the same time of the death of Nellsie. She was dead when Tom Chotkey died. The date of her death is not material to this controversy. Parhose, the father of Nellsie and Tom Chotkey, was a Seminole citizen, and died prior to December 31, 1899, and was not enrolled.

These facts as above set forth conform to the findings of the trial court. The issue is purely a question of law. Both parties recognize the legal fiction that the allotment of Nellsie was an ancestral estate, and that upon her death one-half of her estate passed to her kindred in the line of her father, and one-half to her kindred in the line of her mother; that Alma Chotkey and Tom Chotkey represented the line of the mother of Nellsie, and took that half interest in equal parts attributed to the blood of Cho Chee. Further, that Tom Chotkey alone represented the line of Parhose, the father of Nellsie, and therefore he (Tom) took all that half. It is over this half, represented by the line of Parhose, that this controversy arose. Tom died seized of this one-half as well as one-fourth represented by the line of his mother, Cho Chee.

The contention of the plaintiff in error is well set forth by counsel in their brief as follows:

"Defendants below, and plaintiff in error here, contend that Nellsie is the ancestor of Tom Chotkey in this second descent; that it is the kin of Tom Chotkey of the blood of Nellsie who take on the death of Tom Chotkey; that, on this second cast, the blood of Parhose is not to be considered; that Alma Chotkey, the half-brother of Nellsie was her next of blood kin, and was next of kin of Tom Chotkey, and on the death of the latter, the interest of Tom Chotkey passed to his kin of the blood of Nellsie; and Alma Chotkey took all."

The plaintiffs below, and defendants in error herein, contend, and the court held that on the death of Tom Chotkey, his next of kin of the blood of Parhose took the interest that came to him through his blood of Parhose; that no matter how many descents and different casts, it must follow the blood of Parhose.

The governing statutes, included in chapter 49 of Mansfield's Digest of the Statutes of Arkansas, are as follows:

"Section 2531. In cases where the intestate shall die without descendants, if the estate comes by the father, then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as came by the mother, shall ascend to the mother and her heirs. * * *" (Matter dealing with new acquisitions.)

"Section 2533. Relations of the half-blood

shall inherit equally with those of the whole blood in the same degree; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole blood, unless the inheritance come to the intestate by **descent,** devise, or gift, **of** some one of his ancestors, in which case all those who are **not of the blood** of such **ancestor** shall be excluded from such inheritance." (Emphasis ours.)

The trial court, in reaching his legal conclusions in this case, and in construing these statutes of descent (sections 2531-2533, Mansfield's Digest), followed the rules in force at common law governing the devolution of ancestral estates.

This rule of the common law, and sometimes referred to as the "fifth canon of descent," is as follows:

"The heir must be of the blood of the ancestor who brought the estate into the family; or, to be more specific, the ancestor who last acquired the estate by purchase, no matter how many intervening transfers of title by descent or by gift, or by gratuitous devise from an ancestor there may have been."

The doctrine was applied by the North Carolina Supreme Court, in the case of Poisson v. Petteway, 159 N C. 650, 75 S. E. 930, in which it was said:

"Even since 1842 we think that it has been settled substantially that when an estate goes to a person **through a series of descents or settlements,** and that person dies without issue, it results back to those of his collateral relations who would be heirs of the ancestor from whom it originally descended or by whom it was originally settled. Wilkerson v. Bracken, 24 N. C. 315."

This common-law doctrine, like nearly every other provision of the common law relating to the succession of real property, has never met with any considerable favor by the courts of this country. There are, however, a few exceptions: Pennsylvania, Maryland, and North Carolina being the states adhering to the common-law doctrine relative to ancestral estates. Arkansas has afforded a fertile field for meritorious debate,—the courts of that state having decided the question both ways during the last 20 years.

As against this common-law rule, is the American doctrine, which is as follows:

"On the other hand, by the construction placed upon these statutes in the majority of the states where the question has arisen, it is only necessary and proper to look to the intestate's ancestor, and no inquiry will be made as to the mode in which such ancestor obtained his title. Stated in other ways, the majority rule is that title and succession will not be traced back to remote ancestors, that the statutes refer to immediate and not mediate descents, and that the statutes mean an immediate descent, devise, or gift, and make the immediate ancestor, donor, or devisor the sole stock of descent." 18 C. J. 817.

Had this judgment been rendered before the decision of the Arkansas Supreme Court, in the case of Carter v. Carter, 129 Ark. 7 and 573, 195 S. W. 10 and 1184, the question and problem before us would have been even more complex and more difficult. We think, however, the Carter Case, supra, which we will later discuss, definitely settles the law governing this controversy. But, by reason of the fact that the Carter Case, supra, was not rendered until 1917, a considerable time subsequent to the act of Congress and treaty provisions applying the Arkansas statutes of descent to lands allotted to the Seminole Indians, it will be necessary to discuss the Arkansas law of descended estates, in the light of the interpretation given its statutes, by its own courts of last resort, prior to their adoption by the Seminole Tribe of Indians, which was on June 2, 1900.

It clearly appears that, at the time chapter 49 of Mansfield's Digest of the Statutes of Arkansas, was made applicable to the lands of the Seminole Indians, and for a considerable time thereafter, the exact question presented here had never been directly decided The question was considered on the 13th day of January, 1908, in the case of Johnson v. Phillips, 85 Ark. 86, in which case it was definitely decided that the inheritance must follow the blood of the last purchaser, being the conclusion reached by the trial court in the case at bar. This decision remained undisturbed (so far as this writer knows) until 1917. On April 30, 1917, the doctrine or rule was disregarded in the case of Carter v. Carter. On July 2nd, in the same year, on rehearing in this case of Carter v. Carter, the case of Johnson v. Phillips, 85 Ark. 86, was expressly overruled.

Upon a careful, or even a casual, examination of the textbooks and treatises on real property, it appears that the decisions of the state of Arkansas relating to the succession of ancestral estates have not been entirely understood. It clearly appears that the statutes and their earlier decisions have not been uniformly understood by their own courts.

In 18 Corpus Juris, pp. 816-17, the two rules governing "mediate" and "immediate" descent are stated. The first rule being the one in force under the common law,—that the heir must be of the blood of the ancestor who last acquired the estate by purchase

no matter how many intervening transfers of the title by descent there may have been. The author of this work, in commenting on a related point, states, by way of recital, that the courts of Arkansas adhere to this first or above rule. Tiffany, in his work on Real Property (2nd Ed.) vol. 2, p. 1903, evades either a direct or indirect statement as to what states of the Union follow this common-law rule. Reference is made to the notes in L. R. A. 1916C, 902; and we find the author of the valuable notes therein equally as evasive concerning the rules in Arkansas. He says:

"As simply illustrating statutes preferring the blood from which the property came, see Beard v. Mosely (1875) 30 Ark. 517; Scull v. Vaugine (1855) 15 Ark. 695; Campbell v. Ware (1871) 27 Ark. 65; Kountz v. Davis (1879) 34 Ark. 590; Coolidge v. Burke (1901) 69 Ark. 237, 62 S. W. 583."

In 3 Thompson on Real Property, p. 370, a statement is cautiously made, indicating that the rule might be otherwise than the rule indirectly stated in Corpus Juris, supra. In this connection, the author says:

"Where an estate which an intestate received by descent or devise from his ancestor was acquired by the latter from his ancestor, it would seem that the last or immediate ancestor is the sole stock of descent, and that the kindred who inherit need be of the blood of only such last ancestor." (Citing Oliver v. Vance, 34 Ark. 564.)

It will be observed that the author uses the expression, "it would seem," and avoids making a positive assertion.

These three authorities are but illustrative of the position and attitude of textwriters relative to certain phases of the statutes of descent of Arkansas, as construed by the early decisions of the Supreme Court of that state.

The difficulty, we think, or at least this writer thinks, sprang out of the decision of the Supreme Court of that state in the case of Kelly's Heirs v. McGuire, 15 Ark. 555. The opinion in that case was written by a special judge, who was an eminent lawyer of his time. Being a man of superb learning and much ambition, he attempted in one opinion to erect for the state of Arkansas a sort of "corpus juris" governing the devolution of estates. He either said too much, or not enough, in order to accomplish his intended purpose. To say the least, the opinion was written in such ornate style, and its author employed so many strictly technical terms veiled in mystic phrases, that few men, learned or unlearned, so far, have been able to "translate" all the expressions in the opinion into plain English.

There can be but little doubt that from some of the general expressions set forth in the cases of Kelly's Heirs; West v. Williams, 15 Ark. 682; and Hill v. Heard, 104 Ark. 23, 148 S. W. 254, a considerable portion of the legal profession, during the period of time from 1855 to the year 1917, recognized the statutes of that state governing ancestral estates as an adoption of the common-law principle governing such descended estates.

On the other hand, assuming the correct postulate that, prior to the adoption of the Arkansas statutes of descent as the law governing the devolution of the estates of Seminole Indians in the Indian Territory, and for a considerable time thereafter, the courts of Arkansas had never passed directly upon the issue involved in this controversy; and, further, that the laws of descent in the United States are strictly statutory; and the common-law being so completely superseded by the statutes, and its canons of descent being looked upon with such disfavor by the courts in the American jurisdictions, it is a plausible presumption that a major portion of the bench and bar interpreted the Arkansas statutes of descent in accordance with the American doctrine. This presumption is accentuated, and to a considerable extent fortified, by the recent decisions of the Supreme Court of that state, giving their statute such interpretation.

It was said in the case of Kelly's Heirs v. McGuire, that "it was a partial adoption or recognition of the common-law principle which invariably followed the line of blood."

In West v. Williams, supra, it was said that, in order to carry out the intention of the Legislature to preserve ancestral estates in the line of the blood, "the same means must be resorted to that were used at common law to make it effectual as to descended estates." This language was quoted in the case of Hill v. Heard, supra. In addition thereto, it was there said:

"It will thus be seen that, in the interpretation of this section of the statute of descent, the court recognized it as a partial adoption of common-law principles, and considered it according to the ·rules of the common law relating to such succession."

Even in the case of Carter v. Carter, the court in the first paragraph of the syllabus said:

"* * * Under the statutes, it is the manifest intention of the Legislature, upon the death of the intestate, without issue, to preserve them in the line of the blood from whence they came to the same extent that descended estates were so preserved at common law."

However, the exact holding in that case, as reflected by the second paragraph of the syllabus, is as follows:

"One S. died intestate, leaving a widow E., and two daughters D. and F., who were the children of S. and his widow E. D. died, leaving a son, A., who was her only heir; F. died in childbirth, leaving a child, who died twelve days later. E. was this child's grandmother, and A. was the son and sole heir of its maternal aunt. Held: The lands belonging to F. passed to her child as an ancestral estate from her; that the heirs to inherit from this child must be of the blood of F. Held, further, that the grandmother E., and A., the son and sole heir of D., the maternal aunt, inherited the lands from the child of F. in equal parts."

In the body of the opinion, the court in this case, in overruling the case of Johnson v. Phillips, supra, and announcing a contrary doctrine to that announced in Johnson v. Phillips, said:

"In Johnson v. Phillips, J. A. Phillips died intestate, leaving surviving him his widow and three children. Two of his children died in infancy, leaving Elizabeth Phillips alone surviving. The widow of Phillips married Houston and then two children were born of that marriage. Elizabeth Phillips was a half-sister of the Houston children. She married Nelson, and one child. Elizabeth Nelson, was born unto them. Elizabeth Nelson, born Phillips, died intestate, leaving her infant daughter Elizabeth as her sole heir at law. Elizabeth Nelson, the daughter, died intestate without issue. The half-sisters of Elizabeth Nelson, the mother of the child, Elizabeth Nelson, claimed to inherit the lands when the child died. The court improperly held that they could not inherit, and based its decision on the case of Kelly v. McGuire. It will be noted that in each case the child which died intestate was properly regarded as the stock of descent, and the court said that the child's heirs, who were of the blood of the ancestor from whom the estate came to the child, should inherit. In the case of Kelly v. McGuire, as above stated. the estate came to the child from the father, but the claimants who were the aunts of the child of the half-blood could not inherit because they were only the step-sisters of the father from whom the estate came and were not of his blood. In the case of Johnson v. Phillips. the Houston children were not only aunts of the half-blood of the intestate, Elizabeth Nelson, but they were of the half-blood of the mother, Elizabeth Nelson, from whom the lands came by descent to the child, Elizabeth Nelson. **Hence, they were of the blood of the transmitting ancestor, and the court should have so held.** * * *

"As we have already pointed out, the half-blood. who claimed to inherit in Johnson v. Phillips. were of the blood of the transmitting ancestor, and in so far as that case is in conflict with the principles herein announced, the case of Johnson v. Phillips is overruled. Recurring to the quotation made from Kent and applying it to the facts of the present case, it is apparent that lands having come to the infant Murphy from its mother by descent, the estate was ancestral, and the infant became the stock of descent when it died intestate without issue. The estate passed to its heirs who were of the blood of the ancestor from whom it came. The estate came from the mother and it passed to the heirs of the infant who were of the blood of the mother. The court so held in its former opinion, and rightly so. It will be readily seen that we followed the rule laid down in Kelly v. McGuire."

From this decision the reader will readily see that the court held the term "ancestor" to be the immediate ancestor, or the person from whom the intestate acquired the estate by descent, and that this person (Fannie Murphy) was the "transmitting ancestor," and that the next of kin of the intestate, the infant, need be only of the blood of Fannie Murphy, the mother of the intestate, and not the blood of the intestate's grandfather, Judge Smith, who brought the estate into the family.

It is interesting to note that, in all of these cases, the courts purported to follow the case of Kelly's Heirs v. McGuire. The facts in the case of Johnson v. Phillips are identical with the facts in the present case. In Carter v. Carter, the facts are identical as to the governing principles.

Therefore, it will be seen that the Arkansas Supreme Court, in its most recent decision on the particular question before us, has followed the American doctrine, or rule, that in the construction of statutes governing the descent of ancestral estates, for determining "inheritable blood" it is only necessary and proper to look to the immediate ancestor of the intestate, and no inquiry will be made as to the mode in which the ancestor acquired his title. That the word "ancestor," as used in these statutes of descent, does not mean a lineal ascendant (or perhaps later a descendant), as at common law, but the term means "any one from whom an estate is inherited; the deceased person from whom another has inherited land." 2 C. J. 1334.

We must understand that, during the evolution of the English common law, in connection with determining the "first purchaser," or rather last purchaser, that an auxiliary doctrine, 'evidentiary in nature, sprang up; this rule being that when a claimant by descent had shown that he was an heir of the last person seized, it was presumptive evidence that he was the blood of the last pur-

chaser (or first purchaser counting upward.)

The case of Kelly's Heirs expressly states that even this supplementary or auxiliary doctrine was never made a part of the law of Arkansas. In this connection the court made these observations:

"It supplied the difficulty of investigating a descent from a distant stock, through a line of succession become dim by the lapse of ages. 4 Kent, 386. But, with us, ownership, or title to property, is substituted for seizin; and that maxim seisina facit stipitem, of such controlling consequence in the English scheme of descents, is entirely superseded. By descent or hereditary succession, it is understood the title whereby a person, upon the death of his ancestor, acquires the estate of the latter as his heir at law. 3 Bac. Abr., Descent 104."

In the case of Finley v. Thompson, 68 Okla. 250, 174 Pac. 535, a case bearing considerable analogy to the case at bar, and governed by the same legal principles, the facts being similar and the Arkansas law applying, this court reached a different conclusion than lastly reached by the Arkansas Supreme Court. It held, in effect, without an extended discussion of the matter, without laying down any general rule, and without any particular attempted analysis of cases bearing on the point at issue, that the descent, even on a second cast of an estate of inheritance, follows the line of the blood of the last purchaser or the person who by fiction of law brought the property into the family. This opinion was rendered in June, 1918, more than one year after the decision in the case of Carter v. Carter, heretofore discussed.

In the Finley Case, the points specifically presented in the present case were not fully considered. The case was pivoted largely upon the question as to whether or not the estate, either under a first or second descent, would retain its ancestral character when the persons representing the paternal and maternal line of kinship of the allottee were members of different tribes of Indians. The case makes no mention whatever of the case of Carter v. Carter, supra, directly construing the statutes with reference to this particular point at issue, or rather what should have been the principal issue in the case. The opinion cites the cases of Kelly's Heirs v. McGuire, supra, and West v. Williams, supra, as supporting the conclusions therein reached.

It should be noted that the court in the Carter Case based its decision on the case of Kelly's Heirs, and also upon the decision in Oliver v. Vance, supra (34 Ark. 564, rendered in 1879). This latter case is cited in 3 Thompson on Real Property, p. 370, as apparently supporting the American doctrine adhered to in the case of Carter v. Carter.

We have discussed this matter from both points of view. There is merit to the legal contentions of both sides of this controversy. If we should adopt the theory of the trial court and of the defendants in error, we would be ascribing an interpretation to the Arkansas law which their courts expressly say has never existed and has never obtained, except in one case, which was never followed by the Supreme Court of that state, but, instead, was timely overruled.

We have carefully examined the cases of Kelly's Heirs v. McGuire, Oliver v. Vance, and West v. Williams, and while the matter is not altogether clear, we can reasonably make the deduction that the fifth canon of descent of the common law in its essential features was never in force in the state of Arkansas, except in so far as the decision in the case of Johnson v. Phillips (which was later overruled), transiently impressed the doctrine upon the law of that state.

In view of the foregoing observations, we are constrained to follow the courts of the state of Arkansas in directly construing their own statutes; and, in doing so, to the extent that the case of Finley v. Thompson, 68 Okla. 250, 174 Pac. 535, is in conflict herewith, it is expressly overruled.

In the absence of an express statute or decision of the Supreme Court of the state, whose statute we are construing, announcing or reaching a conclusion at variance with the views herein expressed, we are not at liberty to ascribe to the statutes of that state a doctrine which is alien to our political institutions and system of government, and which doctrine has been generally rejected by the courts of the American states.

The judgment of the trial court is hereby reversed, with directions to proceed in accordance with the views expressed herein.

BENNETT, JEFFREY, HERR, DIFFENDAFFER, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.