EN-LE-TE-KE et al. v. BEASLEY et al.

No. 19939. Opinion Filed April 28, 1931.

. J. B. Campbell, Etha Lawrence, J. Ralph Knight, and A. C. Brewster, for plaintiffs in error.

Hayes McCoy, Warren T. Spies, R. H. Hudson, H. H. Booth, H. K. Hudson, Walter L. Barnes, Chas. L. Orr, Angus M. Woodford, A. S. Norvell, Virgil R. Biggers, and J. D. Simms, for defendants in error.

RILEY, J. This action or controversy involves the devolution of a Seminole allotment where the allottee died after the 31st day of December, 1899, and prior to receiving his allotment, the devolution of which became subject to the provisions of section 2 of the Supplemental Seminole Agreement (31 St. L. 250).

Plaintiffs bring their action in ejectment and for an accounting, alleging that they are all members of the Seminole Tribe or Nation of Indians, and are full-bloods, except Lousanna Harjo, who is alleged to be enrolled as a half-blood citizen or member of said tribe, and allege in substance that they are the owners in fee simple of the lands in controversy and deraign their title as follows:

"1. Sadie Harjo was a member of the Seminole Nation of Indians enrolled as a full-blood after Roll No. 767. She departed this life during the year 1901, intestate, unmarried and without issue in what is now Seminole county, Oklahoma. After her death, to wit, March 1, 1902, there was allotted and set apart in the name of said Sadie Harjo the above-described lands as and for her Seminole allotment, and copies of patents thereto are hereto attached, marked Exhibit A, and Exhibit B, and made a part hereof.

"2. Said Sadie Harjo left her surviving as her nearest of kin, her father, Carchar Harjo, a full-blood member of the Seminole Nation of Indians enrolled after Number 765; her mother, En-wih-Kee Harjo, a full-blood Seminole Indian enrolled after Number 766; and these complainants, brother and sisters of said Sadie Harjo. Of these brothers and sisters, complainants En-le-te-ke, Charlie Harjo, and Lousanna Harjo are of the whole blood, and complainant Co-e-see was a paternal half-brother of said Sadie Harjo."

They further plead that at the time of the death of said Sadie Harjo the law in force governing the descent of her allotted lands was chapter 49 of Mansfield's Digest of the Statutes of Arkansas, for the year 1884, as limited by section 2 of the Supplemental Seminole Agreement, which section, together with sections 2522, 2531 and 2532 of Mansfield's Digest are pleaded at length. They further allege:

"4. On the death of said Sadie Harjo and subsequent to allotment in her name of the lands described in this petition, said lands descended to these plaintiffs in fee subject to a life estate in said En-wih-kee Harjo, the mother of said Sadie Harjo. That said En-wih-kee Harjo died on the 5th day of March, 1923, and these plaintiffs immediately became entitled to the possession of said lands.

"That said En-wih-kee Harjo conveyed to defendants or their predecessors in interest whatever title she inherited immediately from said deceased allottee."

Separate demurrers to the petition were filed and sustained. Plaintiffs electing to stand on their petition, judgment was entered dismissing the action, and plaintiffs appeal.

The plaintiffs contend that, under the provisions of the Supplemental Seminole Agreement, upon the death of Sadie Harjo, her allotted land descended to plaintiffs in fee, subject only to life estate therein in En-wih-kee, her mother, and that upon the death of the mother on March 5, 1923, plaintiffs immediately became entitled to the possession of said lands.

The question, then, to be determined is what part of the land went to the mother upon the death of the allottee, and whether the interest so acquired was a life estate or title in fee. The whole question hinges upon the meaning of the provisions of section 2 of the Supplemental Agreement. It reads as follows:

"If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under

said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters and their heirs instead of the father."

It is clear, under the authority of Shulthis v. McDougal, 170 Fed. 529, and many other cases decided since, that, in the absence of the proviso contained in said section 2, the lands would have descended to the father and mother. in equal parts, since both were Seminole citizens. That is to say, the estate being ancestral in its nature, coming to the allottee by reason of the blood of both father and mother, the land would descend in fee and would be governed by the provisions of the first clause of section 2531, Mansfield's Digest.

In Shulthis v. McDougal, supra, where a similar question involving the distribution of a Creek allotment was considered, it was said:

"Among the people of Arkansas there was no way of acquiring land except by grant, gift, or inheritance. This was true even of lands acquired from the federal government under the public land laws. The patentee of such lands was always required to purchase the same either by residence and improvement, or the payment of a purchase price, or by these elements combined. It needs but a moment's thought to see that when this statute was applied to the lands of the Creek Nation, it was applied to a subject-matter entirely different from that which was in the mind of the Legislature of Arkansas. The lands of the tribe fit into neither of the classes mentioned in the statute. They did not come to a member of the tribe by inheritance from any ancestor. nor could they be spoken of with propriety as a purchase. * * * But when, as here, the time came to disband the tribe, its ownership as a political society could no longer continue, and the division of its property was far more nearly akin to the partition of property among tenants in common than the grant of an estate by a sovereign owner. Under such a scheme it cannot be said that the property which passed to an allottee is a new right or acquisition created by the allotment. The right to the property antedates the allotment and is simply given effect to by that act. Viewing the tribal property and its division in this light, Andrew J. Berryhill acquired his right to the land in question by his membership in the tribe. It was his birthright. It came to him by the blood of his tribal parents, and not by purchase. In applying the Arkansas statute, we shall accomplish the purpose of Congress and the Creek Nation best by treating the lands, not as a new acquisition by him, but as an inheritance from his parents as members of the tribe. His father was the only parent through whom he derived his right, and

to the father the land should pass. If the mother had been a member of the tribe, then the land should properly pass to the parents equally."

Here both parents were members of the Seminole Tribe or Nation. Certainly we have a case where the lands would descend and be distributed according to the laws of descent and distribution of the state of Arkansas (ch. 49, Mansfield's Digest) to the parents. What, then, would be the character or extent of the title thus acquired?

In Kelly's Heirs v. McGuire et al., 15 Ark. 555, the leading case on the law of descent and distribution under the laws of Arkansas, it was said:

"That, as to real estate, it was the design of the Legislature, where there were no descendants, to point out the lines of the succession, and that this is to depend on the fact, whether the inheritance is ancestral or new; and, if ancestral, then whether it come from the paternal or maternal line.

"If the inheritance was ancestral, and come from the father's side, then it will go to the line on the part of the father, from whence it came, not in postponement, but in exclusion of the mother's line; and so, on the other hand, if it come from the mother's side, then to the line on the part of the mother, from whence it came, to the exclusion of the father's line."

It is the last clause of section 2531, Mansfield's Digest, which provides for a life estate only in the father or mother, as the case may be, and this only where the estate is not ancestral.

In order to sustain the contention of plaintiffs it would be necessary to hold that the lands in the hands of Sadie Harjo, had she lived to receive the same, would have been a new acquisition. This would be contrary to the holding of the United States Circuit Court of Appeals in Shulthis v. McDougal, supra, and of this court in Chastain v. Larney, 134 Okla. 127, 272 Pac. 471, and Lincoln v. Herndon, 141 Okla. 212, 285 Pac. 120, and many other cases.

We now pass to the effect of the proviso contained in section 2, of the Supplemental Agreement, quoted above.

Reed v. Narcomey et al., 131 Okla. 153, 268 Pac. 721, is a case involving a Seminole allotment, made and selected as was the one here under consideration. However, in that case there was no surviving mother, nor brother, nor sister, nor descendants thereof. It was there held that the proviso was not applicable, since neither mother, nor brother, nor sister were in esse at the death of the

**258**

allottee, but in discussing the effect of the proviso, Chief Justice Branson, speaking for the court, said:

'The proviso operated as a modification or limita.ion of the applicable provisions of said chapter 49, to the extent ihat the father took no part of the inheritance. The mother took as an heir (just what estate she took is not necessary to determine in this case). If, and when, the brothers and sisters took, they took as heirs in fee simple. Under this proviso, where the re is a mother or brothers and sisters, or both, the mother takes first, then the brothers and sisters, or their heirs."

It will be noted that it was said that: "The mother took as an heir," but it not being necessary there to determine what estate she took, that question was not decided, but it was stated that "if and when the brothers and sisters took, they took as heirs in fee simple."

Referring again to the proviso, we think it was the intention of both parties to the agreement, and of Congress in ratifying it, that the mother, if living, should take the whole of the lands in fee. The proviso says that the "same" (meaning the lands and money and other property) shall first go to the mother instead of the father.

It is contended that reading all the provisions of chapter 49, Mansfield's Digest, applicable to ancestral estates, in connection with the second section of the Supplemental Agreement, including the proviso, only one-half of the lands, representing that portion of the estate that came to the allottee by reason of the blood of the mother, would go to the mother, leaving the other one-half to the father, except for the proviso, and under the proviso to the brothers and sisters.

With this contention we cannot agree. The plain intent of the proviso is that the word "same," referring to the lands, money, and other property, means all and not a part thereof. Otherwise the mother would receive no more under the proviso than without it, for clearly she would inherit one-half of the lands without the proviso.

It is ingeniously argued by one of the parties that the only effect of the proviso is that without it the father would take one-half first, and the mother in the same fraction of a second, but after the father, would take the other one-half, and that under the proviso the reverse would be true, the mother taking first and the brothers and sisters, instead of the father, taking the other one-half in the same fraction of a second.

It must be remembered that the language of section 2 of the Supplemental Agreement deals with the land, money, and other property to which the allottee, if living, would be entitled as a whole, and says that the same shall descend to his heirs who are Seminole citizens. How? According to the law of descent and distribution of the state of Arkansas. This means all the land, money, and property. Had the section stopped there, there would be no difficulty in determining where the lands would go, clearly to the father and mother in equal parts, neither taking before the other, but both taking their respective shares at the same instant of time, but here comes in the limitation or restriction of the proviso and says that in all cases where such property would descend to the parents under said laws (the laws of descent and distribution of the state of Arkansas) the same (in this case the lands only) shall go first to the mother, instead of the father, and then to the brothers and sisters and their heirs instead of the father. We do not think that the words, "and then to the brothers and sisters and their heirs instead of the father," were intended as words limiting the estate thus acquired by the mother to a life estate, but rather indicating how the lands were to descend in case there was no mother and were brothers and sisters.

"It is a well-understood principle of construction, applicable as well to statutes as to deeds and wills, that, when a right is granted or secured, or property conveyed or devised, without words of limitation, they shall be so taken and held absolutely." Hale v. Hunter, 24 Iowa, 181.

The mother having inherited the entire fee, the judgment should be, and is, hereby, affirmed.

LESTER, C. J., and HEFNER, CULLISON, SWINDALL, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. CLARK, V. C. J., not participating.