Judge Marshall
delivered the opinion of the Court.
William Wells, the owner of a tract of unimproved land containing upwards of 700 acres, had it divided by survey in 1826, avowing that he intended it for his two sons Samuel and Francis, and Samuel being then just married, went upon the land intended for him under this avowal of his father, built a house and resided on the land until his death in 1833, having in the meantime cleared for cultivation some 40 or 50 acres, and erected convenient buildings. Pie left a widow, .the daughter of James Head, and two infant children of the marriage, Mildred and William. The possession seems to have been continued for the benefit of the family of Samuel Wells, the land being at first controlled or rented out by his administrator. Afterwards his widow intermarried with one Sneed, who was appointed guardian of the children, and held the possession. In 1838, William Wells, the father of Samuel, died, leaving a widow, and after having at some antecedent period entered upon the land, and had 50 acres of it suiweyed, which he said he intended to give to his son’s widow for her dower. In 1839, commissioners were appointed to divide the real estate of William Wells, and they divided the tract into three parts, of which, one was allotted to Mildred and William Wells, infant children of Samuel Wells, deceased, one to Francis S. Wells, son of William, deceased, and one to Letitia Pemberton, his daughter, the persons just named being the only heirs of said William. A deed corresponding with this division, was made by the commissioners to Mildred and William Wells, and approved by the Court in May,. *167 1839. William Wells, the son of Samuel, died in 1848, in infancy, and unmanned, having survived his sister Mildred, who died unmarried, and his mother, who had no child by her second marriage. But whether his mother or his sister died first, is uncertain. The land allotted and conveyed to the children of Samuel Wells, included their improvements, but not the whole of the land of which their father had taken possession.
First question for adjudication, whether the title' descended irom the father of giand-falher.
In March, 1849, James Head, the maternal grandfather of William Wells, the son of Samuel, filed this' bill against his maternal grand-mother, Elizabeth Wells» widow of William Wells, senior, and the descendants of Francis S. Wells and Letitia Pemberton, claiming that the land had descended to Mildred and William Wells, from their grand-father, and under the law of descents in this State, he was entitled to one moiety of the land of which William Wells, junior, had died seized, and that the paternal kindred above described, are entitled to the other moiety. The paternal grandmother, Elizabeth Wells, concurs with the statement and claim of the bill. But the other defendants rely upon the gift of the land by William Wells, senior, to Samuel and the subsequent possession, and claims that the land descended to Samuel’s children from their father, and not from their grandfather, and that under the 5th section of the act of descents of 1797, (Statute Law, 563,) the kindred on the side of the mother of the infant decedent are excluded from participation in the inheritance with the brothers and sisters of his father, or their descendants.
The first question to be determined is, whether the case comes within the fifth section above referred to, which is an exception from the general course of descent. And this question depends upon the question whether the title which William Wells, junior, had at his death descended to him from his father or from his grand-father. If from his grand-father, then the 5th section does not apply, and for want of mother, brothers, sisters, and their descendants, the estate descends *168 ;n equal moieties to the paternal and maternal kindred of William; the grand-father on either side, if there be one, being entitled to one entire moiety to the exclusion of all others, and if there be on either side no grandfather living, then the moiety to which he would have been entitled, passes to the grand-mother, uncles and aunts, and their descendants, on the same side, or such of them as there be. .In which case, the grand-mother would take one-third of the moiety of this estate, the descendants of Francis S. Wells, would- take one.third per stirpes, and the descendants of Letitia Pemberton would take the remaining third in the same manner. But if the title which William Wells had, descended to-llina from his father and not fiom his grand-father, then the fifth section applies, and the question arises as to its effect. That section declares that “when an infant shall die without issue, having title to any real estate of inheritance, derived by purchase or descent from the father, the mother of such infant shall not succeed to, nor enjoy the same or any part thereof, (saving her right as dowress,) if there be living any brother or sister of such infant, or any brother or sister of the father, or any lineal descendant of either of them. In the case of Clay, &c. vs Cousins, (1 Mon. 75,) this Court seems to have considered the whole force of this section as confined to the exclusion of the mother, and to the case of there being a brother or sister of the infant or of the father, or any descendant of either. If this be so, then although there be a brother or sister of the infant or of his father or descendants of such brother or sister, the mother alone is excluded; and although if the mother be living the case would not happen in which the statute directs the estate to be divided into .two moieties,-one to go to the paternal and the other to the matezmal kindz’ed; yet if there be no mother at the death of the infant, the case for such division happens precisely according to the letter of the statute, and there is nothing upon which the prohibition of the fifth section can opez-ate.
The provisions of the Virginia Statute of descents of 1785, regards only the kindred of the decedent, disregarding t h e blood of the first purchase, placing the paternal and maternal kindred on the same footing.
Whether this strict construction of the 5th section, (or as may be said of the 5th and 6th sections, for the 6th makes a similar provision where the title is derived from the mother,) should be carried out, and the exclusion be confined alone to the parent 'from whom the title was not derived, we need not for reasons presently appearing, decide in this case. We remark however," that although it may seem incongruous to exclude the mother,if living, and yet if she be dead, to admit her kindred to the same participation in the inheritance, as if she might herself have enjoyed it if living, yet such appears to be the letter of the section. And as the provisions of the 5th and 6th sections, taken from the Virginia act of 1790, are innovations upon the original act of 1785, and are exceptions from the general principle, and course of descent adopted from that act into the act of 1797, before referred to, a strict construction may not be unreasonable.
The act of 1785, regards only the kindred of the decedent, and totally discarding all reference to the blood of the first purchaser, or of the ancestor from whom the title descended, placed the paternal and maternal kindred on precisely the same footing. A reference to the cases in which these provisions of the act of 1790, incorporated into our act of 1797, came up for construction before the Courts of Virginia, will show the disfavor with which they regarded this partial return to. the feudal principle of preference for the blood of the first purchaser. It may not be inconsistent with the general spirit and object of the statute to disregard wholly the line of ancestors through which the title has come, even to an infant decedent, except in cases coming literally within the letter of the 5th and 6th sections, and to the extent literally prescribed by them. Such was the principle and basis of construction in the case of Clay, &c, vs Cousins, above referred to, and. in that of Duncan vs Lafferty’s adm’r., (6 J. J. Marsh., 47,) in which it was decided that the father of the infant decedent is excluded only when the estate comes to the in *170 fant from the mother herself, and not when it comes from her father, and of course not when it comes from her child.
Where infants die possessed of real estate of inheritance not de rived from the", father, where such infant leaves at his death no mother, nor brother, nor sister, nor their descendants, the maternal and paternal kindred are entitled to the estate in equal moieties.
‘ The same is the case where it descends to the infant from the grand-father.
Where a son enters upon land of his father by his consent, looking to his father for title, the possession is not adverse.
. Then from whatever source the title came to Mildred and William Wells, the infant children of Samuel, when Mildred died her interest of one half descended either to her brother alone, or to her mother and brother jointly and equally. And whether in one way or the other, the death of both sister and mother concentrated the entire title in William, and he must have derived one-half by descent either from his sister alone or from his sister and his mother, and not by descent- from his father or his grand-father. As to one half of the land, therefore, his death under age and without issue did not njake a case under the 5th section, but leaving at his death no mother, nor brother, nor sister, nor their descendants, his paternal and maternal kindred were on his death entitled to equal moieties of that half under the 7th section of the act of 1797, unless there might be to some extent an exclusion under the- 6th section, which is not claimed.
With regard to the other half, we can come to no other conclusion than that the only estate of inheritance which William Wells had at his death, was by title derived not from his father, but from, his grandfather; and that in fact his sister Mildred had no other title at her death. Samuel Wells had no other title in the land but a mere possession, which even, if it had been adverse to the title of his father, had not ripened into a title either at his own death or at the death of his father.
But his possession was not in fact adverse. It was taken and held by permission of his father, and in expectation of a gift from him. And whatever equities he may have acquired with respect to the improvements made by his labor, he held the possession in subordination to his father—looking to him for a gift of the title. He was in effect but a tenant at will, subject to the loss of his possession at least upon notice, and to a loss of *171 his expected title without notice. He had no estate of inheritance nor title to such estate during his life norat his death. And although his possession was continued by, or on behalf of his representatives, its character was still-the same, until upon the death of his father the title-descended in parcenary to his children, together with the other heirs. If this title could have been re-, jected, there was never any indication either on the part of Samuel or of his children or of those who acted for them, that it would be, or that it was rejected. On the contrary, the division by the County Court, and the acquiescence in it without objection even now made, when it took from these children a part of the land which their father and themselves might have claimed under the gift, shows if acceptance were important, that the title of the grand-father was accepted for the infants, and must suffice at least to prove the character of the possession held for them, and which was their only interest in the land.
If an only son enter upon land having his lather’s bond lor title, and'the father die, the equitable title merges in the legal: (Benton on real property. 426— 3 Vesey,jr., 329. Ib. 120. 6 Mad. 118 ) So an estate at -will of the son from the father under like circtimstances.
But the law cast upon them the title of their grandfather, and as it was perfect, being strengthened and not weakened by their possession, it was in fact and in law their only title.
If an only son holds a bond upon his father for the gratuitous conveyance of a specific tract of land, and the father dies, the title by the bond is merged in the legal title. Where an equitable estate becomes united with an exactly coinciding legal estate, the former is extinguished: (Barton on real property, 426, 3 Vesey,jr., 329, same 120, 6 Mad. 118. And certainly an estate at will would merge in a fee simple title descending on the tenant, As Samuel Wells was either a tenant at will, or at most a quasi tenant with some equity to a conveyance, if this estate or interest descended to his children, it was merged in the title which was descended from their grand-father whose tenants or quasi tenants they were. And the descent from them and each of them must be of the title thus in them, and according to the course of descent of the legal title which never . ' *172 was in their father, and never was in them except by descent from their grandfather. It was by this title alone that the land was held after the death of the grand-father, and an adverse title cannot now be set up on the previous facts, to prevent the regular descent of the land according to that title. It follows that the complainant Head, the maternal grand-father of William Wells, is entitled to one moiety of the land, which is all that he claims.
W. Morris, and M. Brown, for appellants; Harlan for defendants.
The decree being in conformity with this opinion, is therefore affirmed.