## Spencer v. Turner Elkhorn Coal Company, et al.

(Decided December 7, 1926.)

## Appeal from Floyd Circuit Court.

1. Witnesses—Plaintiff's Statement that Father, who was Dead, Gave Her Land in Controversy was Properly Excluded (Civil Code of Practice, Section 606, Subdivision 2).—In action to quiet title to land, plaintiff's father being dead, her statement that her father gave her land in controversy held properly excluded, in view of Civil Code of Practice, section 606, subdivision 2.

2.  Gifts—Long Continued Use and Cultivation of Father's Land by Daughter did Not Raise Presumption of Gift from Father.—Long continued use and cultivation of land, owned by father at time daughter went into possession, held not to raise presumption that land was originally given to her by father.

3.  Adverse Possession—Where Child is in Possession of Parent's Land, Possession is Not Adverse, Unless Clear Notice of Intention to Claim Adversely has been Brought Home to Parent.—Where child is in possession of parent's land, in absence of evidence of parol gift, presumption is that possession was amicable and will not be held to be adverse, unless clear notice of child's intention to assert exclusive ownership is brought home to parents.

4.  Adverse Possession—Evidence Held to Justify Ruling that Daughter Had Not Acquired Title by Adverse Possession to Property Owned by Father.—Evidence being conflicting as to whether daughter was in exclusive possession of land owned by father at time she took possession, and later owned by brothers, and it not appearing that claim of adverse possession was brought home to parents or brothers, held to justify ruling that she had not acquired title by adverse possession.

C. B. WHEELER for appellant.

B. F. COMBS, SMITH & COMBS and COMBS & COMBS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

This is an action to quiet title to a small tract of land in Floyd county. From a judgment in favor of the defendants plaintiff appeals.

The facts are these: Plaintiff is a daughter of John B. Turner, who owned a 390 acre survey. The adjoining land was owned by his brother, William Turner. About the year 1878 or 1879, plaintiff and her husband moved on a tract of land on the right fork of Hampton branch then owned by her uncle, William Turner. Her house was about 100 yards from the tract of land in dispute. Some time after moving on the William Turner tract, William Turner died without issue and his lands descended to his brothers and sisters, including John B. Turner, who bought the interest of the other heirs. Shortly prior to 1895 John B. Turner became financially involved. Judgments were procured against him and his lands outside of the 390 acre survey were sold on execution to J. W. Hatcher. The 390 acre survey whereon he lived was set apart to him as a homestead. Later on Hatcher conveyed the lands purchased by him to Preston

Turner, one of the three sons of J. B. Turner, probably in trust for J. B. Turner. On Preston Turner's death the lands outside of the 390 acre survey were partitioned among the heirs of John B. Turner, and the land which Mrs. Spencer received embraced the land on which she lived. In 1897 John B. Turner and wife conveyed the 390 acres to their sons, Preston, Lee and J. D. Turner jointly. On his death Lee Turner devised his portion to Preston and J. D. Turner. Preston Turner then died and his one-half interest in the land was inherited by his mother, Mary Turner. Later on, Mary Turner conveyed her one-half of the land to J. D. Turner, who thus became the sole owner of the 390 acre survey, of which the land in dispute is a part. The Turner Elkhorn Coal Company, a partnership, operates a coal mine under a lease from J. D. Turner covering the land in controversy and other adjoining land. W. G. Reece and P. L. Salisbury are employes of the coal company. M. L. Lawson is the lessee of the surface.

According to appellant's evidence her father gave her the land about the year 1879 and placed her in possession. She further says that she enclosed the land and has been cultivating and claiming it ever since. During that time neither her father nor her mother nor any of her brothers or sisters ever claimed the land or questioned her right to it. Mart Beverly, who was 62 years of age, and who lived about two miles from Mrs. Spencer and had been acquainted with the parties and the land for 30 or 35 years, testified that the farm was known as the John B. Turner farm. So far as he knew Mrs. Spencer had been in possession of it. She had farmed and cultivated it. She had been using it that way ever since he had known anything about it. He had helped her at workings and they had helped him. No one that he knew of had ever used the land except Mrs. Spencer and her family. He was not there every year. He could not say the fence was kept around the land all the time. He did not know whether there were some years that there was no crop raised on it. The land was known as the John B. Turner farm. So far as he knew J. B. Turner had control of all this land up until he died. He never knew of John B. Turner or any of his family using or cultivating the land. Alamander Martin, who was 73 or 74 years of age and was raised in sight of the land, testified that no one except Mrs. Spencer and her family used the land

during the last thirty years.  He never recollected seeing
the land but what there was something on it.  On cross-
examination he stated that John B. Turner placed his
children on different parts of the land.  Mrs. Spencer
further testified that she entered on the land with her
father's permission and consent and remained on it with
his permission and consent from the time he gave it to
her.  Dick Allen, who had known the land for 35 years or
longer, testified that Mrs. Spencer had been in posses-
sion of the land since he knew it.  She cultivated it by
raising corn, cane, oats, sweet potatoes, and anything else
that could be raised.  She cleared all the same boundary
up the hill.  Mrs Spencer claimed the land as her own.
On one occasion while threshing for her father he said
that witness would have to go up and thresh some for
Mrs. Spencer, which was on the land in dispute.  Link
Salisbury, Mrs. Spencer's brother-in-law, testified that
he had known the land for about 50 years.  Mrs. Spencer
was then in possession of it and had been in possession of
it for 35 years.  So far as he knew she used it as her own
land and raised corn and everything else that would
grow.  So far as he knew, no one else claimed it. Whether
Mrs. Spencer claimed it, he did not know.

On the other hand, M. L. Lawson, who was reared on
the adjoining farm, testified that the children and sons-in-
law of J. B. Turner lived on different parts of the farm.
J. B. Turner always claimed to own the several pieces of
land.  As he understood it they were cultivating the land
by his permission.  When he attempted to plow the land
in 1921 Mrs. Spencer told him that she was going to try
to hold it; that she knew that she could hold it for that
year because she had not been notified to get out; that she
knew she did not own it, but people told her that she
could hold it because her father put her in possession of
it forty years ago.  W. G. Reece, the manager of the Tur-
ner Elkhorn Coal Company, testified that there was
about fifteen acres of the disputed land, and that Mrs.
Spencer was cultivating the land.  J. D. Turner, the
title holder, testified that the beginning corner of the
Nancy Spencer mineral deed to G. R. Martin was "two
beeches on the end of the fork point between the two
forks of Hampton branch."  The land from which the
mineral was sold was the same tract of land allotted to
Mrs. Spencer.  Mrs. Spencer had been allowed to culti-
vate a portion or maybe all of it for probably 25 or 30

years. This was done with the permission of the owner, John B. Turner, Preston Turner and himself since he came in possession of it. Mrs. Spencer never made any claim of ownership to the land in dispute. Mrs. Spencer had been living on the adjoining land for about 40 years. She was permitted to use the land in dispute merely as an accommodation. The original fence was a rail fence and was built by John B. Turner in his lifetime. From time to time Mrs. Spencer cultivated other portions of the land. The fence was built under instructions of J. B. Turner, the owner of the land, by what were called the workings, that is, by inviting all the able-bodied men to come in and do the work. It was built for the purpose of clearing up the land and primarily to give assistance to Mrs. Spencer. At one time he and his sister had a conversation relative to swapping her mineral for a part of his surface. That was about five years ago. On cross-examination he stated that Mrs. Spencer was in possession of this land in the sense that she was using it when the deed was made by his father to his two brothers in 1897. She was also using it when his brother Preston died, and when his mother executed a deed to him on December 7, 1914. However, she was permitted to use it as an assistance and help to her. A. L. Martin, a brother-in-law of Mrs. Spencer, testified as follows: At the time the land outside of the 390 acre survey was partitioned Mrs. Spencer made no claim to the land in dispute. She only claimed that she ought to have some bottom land. The first time he knew of Mrs. Spencer making any claim to the land was during the spring before he testified. So far as he knew, she was permitted to use the land as well as other lands of the homestead. Mrs. Spencer began clearing some parts of the tract after she moved up there. She and her family would cultivate portions of it each year. They were using a portion of the land in 1883. A number of times other people used the land on the lower side of the branch. Old man Turner tended it in his lifetime, and he made the fence. Old man Turner had the first clearing made. His other children cultivated portions of the land, but none of them claimed such portions as their own. G. R. Martin, a nephew of Mrs. Spencer, testified that he purchased from her the minerals in her land in 1916. The contract, which is in the record, calls for the lines of J. D. Turner on the east and south. It embraces the same boundary later conveyed by Mrs.

Spencer to him pursuant to the contract. He understood from her that the contract included the mineral in all the land that she owned. The first part of the description in the deed conveying the minerals pursuant to the contract is as follows:

"Beginning at two beeches on the end of the fork point between the two forks of Hampton branch; thence up the point with the line of Mary Turner and J. D. Turner."

There was further evidence that Mrs. Spencer never listed the land in dispute for taxation, or paid any taxes thereon. She claims that the reason she did not pay the taxes was that she worked for her mother, who agreed to pay the taxes for her.

As Mrs. Spencer's father was dead when she testified, the court properly excluded her statement that her father gave her the land. Civil Code, section 606, subsection 2. The propriety of this ruling is not questioned, but it is insisted that the long continued use and cultivation of the land is sufficient to raise the presumption that the land was originally given to her by her father. In view of the custom of parents to place their children on different portions of their lands, and to permit them to cultivate such portions for their support, the presumption, in the absence of evidence of a parol gift, is that the possession was amicable, and will not be held to be adverse unless clear notice of the child's intention to assert an exclusive ownership in the land is brought home to the parents. Butler v. Butler, 133 Ala. 377, 32 S. 579; Wells v. Head, 12 B. Mon. 166; Ward v. Edge, 100 Ky. 757, 39 S. W. 440; Robinson v. Huffman, 113 S. W. 458; 2 C. J. 158. Here the evidence is conflicting as to whether Mrs. Spencer was in the exclusive possession of the land. While there is evidence that she claimed the land, it does not appear that this claim was brought home either to her parents or to her brothers. On the contrary, there was evidence that she desired to trade some of her mineral land for a portion of the surface of the land in dispute. Not only so, but the mineral deed which she executed to G. R. Martin, wherein the land is described as "beginning at two beeches on the end of the fork point between the two forks of Hampton branch; thence up the point with the line of Mary Turner and J. D. Turner," was a clear recognition of the title of Mary Turner and J. D. Turner

to the land in dispute at the time the deed was executed. In addition to this, there is the further evidence of A. L. Martin that Mrs. Spencer told him that she knew she did not own the land, but that people told her that she could hold it because her father put her in possession of it 40 years ago. In view of these considerations, we are constrained to hold that the chancellor did not err in ruling that Mrs. Spencer did not acquire title by adverse possession.

Judgment affirmed.